Walter K. KRAUTH, Jr., William Miller, David E. Legere, Plaintiffs,

v.

EXECUTIVE TELECARD, LTD., Defendant.

No. 95 Civ. 3967 (RWS).

United States District Court, S.D. New York.

June 20, 1995.

As Amended June 26, 1995.

Sutherland, Asbill & Brennan, New York City (Michael J. Levin, Peter J. Anderson, of counsel), for plaintiffs.

Ziegler, Ziegler & Altman, New York City (Steven Altman, Kenneth R. Ashford, of counsel), for defendant.

Richard Emery, New York City, for Sp. Committee of Independent Directors of the Bd. of Directors of Executive Telecard, Ltd.

### OPINION

SWEET, District Judge.

In this control contest version of the current Bosnian conflict, the Defendant Executive Telecard, Ltd. ("EXTL," "TeleCard" or the "Company") has moved under Rules 12(b)1 and 12(b)6, Fed.R.Civ.P., to dismiss this action on a jurisdictional basis, for lack of a federal question or, in the alternative, for summary judgment under Rule 56, Fed. R.Civ.P. Plaintiffs, Walter K. Krauth, Jr. ("Krauth"), William Miller ("Miller") and David E. Legere ("Legere") (collectively, the "Shareholders Protective Committee" or the "SPC") have moved under Rule 65, Fed. R.Civ.P. for injunctive relief to bar the distribution of an EXTL proxy statement and to enforce a settlement of the proxy contest between the parties based upon an agreement in principle. For the reasons discussed below, the Defendants' motion to dismiss is denied and Plaintiffs' motion is granted in part and denied in part.

### Parties

Plaintiff Krauth is a resident of Jonesboro, Georgia. He and Miller, a resident of Bayside, New York, and Legere, a resident of Williamsburg, Virginia, formed the EXTL Shareholders Protective Committee, in September 1994 for the purpose of soliciting proxies for the election of a slate of directors opposed to those being proposed by management of EXTL.

Defendant EXTL is a corporation incorporated in Delaware. It started operating in 1989 and now has a substantial world-wide business.

EXTL has a single class of stock authorized, issued and outstanding—common stock with a par value of $.001. This common stock is registered pursuant to § 12(b) of the Exchange Act and is listed and traded on the NASDAQ—National Market System. 12,-345,362 shares of this common stock were outstanding as of January 31, 1995.

EXTL's principal business is the provision of telecommunications services that enable customers, when placing phone calls within and between phone companies, to avoid high surcharges imposed by hotel switchboards. EXTL operates through agreements with over 60 Postal, Telegraph and Telephone Authorities ("PTTs") and other telecommunications administrations outside the United States to deliver these services. The agreements with PTTs authorize EXTL to install its own hardware and proprietary software at

or near each of the PTTs' telephone-switching sites, thus allow EXTL customers to make calls from one country to another without necessarily having to be routed through the United States.

In the United States, EXTL has offices in New York and Colorado. Abroad, EXTL maintains office space in France, Belgium, Hong Kong, Singapore, Argentina, Anguilla and Switzerland. The Corporation provides services in over fifty countries throughout the world.

### Prior Proceedings

The prior proceedings in this action (the "Fifth Action" or "Krauth V") are fully set forth in the opinions of October 21, 1994 (the "October 21 Decision"), *Krauth v. Executive Telecard*, 1994 WL 584556 (S.D.N.Y.1994) and December 13, 1994, *Krauth v. Executive Telecard*, 870 F.Supp. 543 (S.D.N.Y.1994) in the first *Krauth* action, 94 Civ. 7337 (RWS) (*Krauth I*); May 8, 1995 in *Krauth v. Executive Telecard*, 1995 WL 272556, 95 Civ. 106 (S.D.N.Y.1995) (the "Third Action" or "*Krauth III*"); and May 31, 1995, *Krauth v. Executive Telecard*, 887 F.Supp. 641 (S.D.N.Y.1995) ("May 31 Opinion" in "*Krauth IV*"), familiarity with which is assumed. A review of the prior proceedings relevant to this motion follows:

On October 7, 1994 EXTL commenced an action against Krauth, 94 Civ. 7282 (MHM), in this district and obtained an order to show cause which set down a date for hearing its motion for preliminary injunction to bar the distribution of proxies until after that hearing. On October 11, EXTL extended the date for its shareholders' meeting to October 28 and voluntarily dismissed its action.

On October 12, the SPC commenced an action, *Krauth I*, 94 Civ. 7337, seeking to enjoin EXTL from soliciting proxies in violation of the Securities and Exchange Act of 1934. EXTL sought similar relief with respect to the Committee's proposed proxies, by way of a counterclaim, mirroring its original complaint. The parties were advised that the Court would consider the consolidation of a trial on the merits with the hearing on the preliminary injunctions. Expedited discovery proceeded.

On October 18, an evidentiary hearing consolidated with the trial was held in the course of which the state law counterclaims against counterclaim defendant Mayer, aligned as a plaintiff, were severed.

In *Krauth I*, Krauth challenged the EXTL proxy statement for omitting material information concerning the role of Richard O. Bertoli ("Bertoli") in the management and affairs of the company. Bertoli is a former advisor to the company and at that time and at present a convicted and incarcerated felon. Krauth also attacked the EXTL proxy solicitation for failing to include material facts concerning a proposed restructuring of EXTL.

In the counterclaim, EXTL challenged the Krauth proxy statement for inaccurately describing EXTL's July 29, 1994 board meeting, failing to identify accurately the role of Theodore J. Mayer[1] ("Mayer"), including a deceptive chart and stating that the effect of the restructuring would be to remove assets from the jurisdiction of the United States.

In the October 21 Opinion, the Court found that:

> EXTL's proxy statement had failed to disclose the consultations between Bertoli and the corporate officers on pending issues of corporate management, including the proposed restructuring and the proxy contest, consultations which were conducted while Bertoli [was] serving a criminal sentence of obstructing an investigation into his conduct related to an alleged securities fraud. The omission violates Rule 14a–9, False and Misleading Statements, which charges: "No solicitation subject to this regulations shall be made by means of any proxy statement ... containing any statement which, at the time and in light of the circumstances under which it is made, is false and misleading with respect to any material fact, or which *omits* to state any material fact necessary in order to make

---

1. Mayer had been the Treasurer of EXTL until he was discharged on September 30, 1994.

the statements therein not false or misleading. . . ." (emphasis added).

*Krauth,* 1994 WL 584556 at *6.

In finding a violation of Rule 14a–9, the Court stated that:

[i]ssues of management integrity are central to the election of directors, and the fact that certain of the current directors and officers chose to review corporate affairs, share confidential documents, and seek the advice of a person with Bertoli's criminal history is material to the discharge of their fiduciary obligations. (citations omitted).

*Id.* at *7.

In concluding that Opinion, the Court stated that:

For the reasons discussed above, EXTL will be enjoined from soliciting proxies without disclosing the consultation by certain officers and directors with Bertoli concerning confidential and pending corporate matters. The Committee will be enjoined from soliciting proxies without clarifying the jurisdictional effect of the proposed spin-off. Leave is granted to make any further applications to obtain relief consistent with these findings and conclusions.

All other challenges to the parties' respective proxy statements were not sustained. No appeals or motions for reconsideration were filed in that action. On November 2, 1994 there was a hearing on a letter motion requesting that the Court order Defendants to set a date for the next Annual Shareholders meeting. Prior to that hearing, Defendants set a meeting date of January 5, 1995. The motion was "[d]enied as moot in view of the action taken by the defendants." *Memo Endorsed Order,* November 2, 1994. Judgment was entered on December 12, 1994 dismissing *Krauth II.*

On December 9, EXTL filed a complaint alleging security act violations by the Committee and moved by order to show cause for a preliminary injunction to bar the Committee from solicitation based on the alleged omission of material facts. *Executive Tele-*

*card, Ltd. v. Krauth,* 94 Civ. 8911 (RWS) (*Krauth II* ). A hearing on that application was scheduled for December 15 with expedited discovery granted. The Court was informed on the 15th by the parties that the action would be dismissed. A notice of voluntary dismissal, signed by the Court, was filed on December 16, 1994.

On December 30, 1994, EXTL began distributing its revised proxy statement with a transmittal letter to shareholders.

On January 6, 1995, the SPC filed a complaint in the third action, 95 Civ 106 (*Krauth III* ). The complaint alleged violations of the Exchange Act and the rules and regulations promulgated thereunder and sought various forms of injunctive relief, damages, and other forms of relief. Specifically, the complaint stated 23 deficiencies in the transmittal letter and the proxy statement which it alleged were false and misleading, in violation of federal securities law.

The SPC also moved by order to show cause for expedited discovery, a temporary restraining order and a preliminary injunction. Expedited discovery was granted and a hearing on the motions was held on January 16, 1995.

On January 20, counsel to the SPC wrote to the Court informing the Court that the Third Action would be dismissed pursuant to Rule 41(a) Fed.R.Civ.P. with prejudice pursuant to a settlement agreement between the parties. The Court so ordered the dismissal on January 23, 1995.

On March 1, EXTL and Plaintiffs filed a joint motion asking the Court to vacate the judgment and opinion in *Krauth I.* In their motion, the parties stated to the Court that:

On February 15, 1995, a "Settlement Agreement–Summary of Terms" was executed, memorializing the material terms of the settlement. A copy of that document is annexed hereto as Exhibit A[2]. . . .

The parties' settlement is not conditioned upon the filing and granting of this joint motion . . . The parties believe, however, that such vacatur is appropriate and war-

---

**2.** The Exhibit is a copy of a document, discussed later in this opinion, called "Settlement Agreement—Summary of Terms" which is signed by

Miller, Legere and Carl J. Corcoran, the then Chief Executive Officer and Chairman of the EXTL Board of Directors ("Corcoran").

ranted because the Judgment and the Opinion have been released and discharged by the settlement, and because it is no longer equitable that the Opinion and the Judgment have prospective application in that the corrective disclosure required thereby has already been made and the parties have agreed that a further proxy statement will be disseminated to the shareholders of Executive TeleCard, Ltd. announcing a new combined slate of nominees for election to its board of directors

. . .

The Court denied the motion on March 2, 1995.

On March 29, 1995 the Plaintiffs filed an order to show cause to bring on a motion to set aside this dismissal. The motion sought an order: 1) vacating the dismissal of The Third Action and its reopening pursuant to Rule 60(b); 2) granting Plaintiffs leave to amend their complaint to state a claim for enforcement of the settlement agreements; 3) directing EXTL to comply with the terms of the settlement agreements including to require it to issue proxy materials with the compromise slate of nominees to the Board of Directors, to establish a record date, and to schedule and conduct its annual shareholders meeting; and 4) appointing a special master to effectuate the terms of the settlement and compliance with this Court's Orders by EXTL until the annual shareholders meeting can be held.

EXTL opposed the motions on jurisdictional grounds and a hearing was held on April 13, 1995. By opinion of May 8, 1995, it was held that an independent basis of jurisdiction would be required in order to hear the breach of settlement agreement claims, in accordance with the Supreme Court's decision in *Kokkonen v. Guardian Life Ins. Co. of Am.,* —— U.S. ——, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) and that additional proof on the issue of the citizenship of EXTL was required to determine if complete diversity existed at the time the motion to set aside the order of dismissal was filed. A hearing date was set for May 16, 1995.

On May 15, 1995 a new action was filed by Plaintiffs (95 Civ. 3491 (RWS)) (*Krauth IV*) which sought: damages for breach of con-

tract; specific performance of the settlement agreement; appointment of a special master to effectuate the terms of the settlement agreement; an order setting the date of the next shareholder's meeting; and attorney's fees. Subject matter jurisdiction of that action was based on an assertion of complete diversity of the parties. *Krauth IV* was accepted as related to *Krauth III.*

The parties in the Third Action appeared before the Court on May 17. The Court then memo endorsed the motion in the Third Action, "[t]his motion is marked withdrawn as set forth in open court this date," and that action was closed.

In *Krauth IV*, Defendants brought on a motion to dismiss for lack of subject matter jurisdiction by order to show cause. Argument and the testimony of Edward J. Gerrity ("Gerrity"), then and current Chair of EXTL, was heard on May 30, 1995.

In an opinion dated May 31, the motion to dismiss was granted, and on a finding that Plaintiffs failed to establish Denver as EXTL's principal place of business, *Krauth IV* was dismissed.

On May 24, 1995 the Company disseminated a 44-page Proxy Statement announcing a June 30, 1995 Shareholders meeting to elect a new slate of directors which included: Gerrity, the Current Chair of the Board and of the Independent Committee; Anthony Balinger ("Balinger"), the Acting President and Chief Financial Officer, Stig Sonnerberg ("Sonnerberg"), an incumbent independent director, who had replaced Corcoran as a member of the Independent Committee; and three unaffiliated nominees, including David Warnes ("Warnes") and Ebrahim Ali Abdul Aal, to ratify the appointment of BDO Seidman to serve as independent public accountants to the Company for Fiscal 1995, and to transact any other necessary corporate business.

A complaint in this action (the "Fifth Action," "*Krauth V,*" or the "Action") was filed on June 1, 1995. An amended complaint was filed on June 6, 1995 and, with leave of the Court, a Second Amended Complaint was filed on June 8, 1995, a Third Amended Complaint (the "Complaint") was filed on

June 15, 1995, which added alleged violations found in the revised proxy materials.

The Defendants' present motion to dismiss, or in the alternative for summary judgment, was filed on June 1 and brought on by an order to show cause made returnable on June 7, 1995 and Plaintiffs' motion for preliminary and permanent injunction was brought on by order to show cause returnable June 8, 1995.

Argument on both motions was heard on June 8, 1995. After hearing argument on the motion to dismiss, the Court stated that it would convert the 12(b)(6) motion into one for summary judgment and that it would reserve decision on the summary judgment motion. The Court also stated that it would "try the allegations of false and misleading proxy statements and the contract case."

Witnesses were heard on June 8, 12, 13, and 15, and final argument was heard on June 16.

A supplemental proxy statement was issued by the Company on June 12.

### The Complaint

The Complaint alleges breach of contract (Count One); seeks injunctive relief and specific performance of the contract (Count Two); alleges 25 violations of Section 14(A) of the Exchange Act and Rule 14A–9 (Count Three); alleges violations of Section 211 of the Delaware General Corporate Law for failure to have a timely shareholders meeting (Count Four); asserts counts one and two on behalf of Krauth individually, particularly because, it alleges, the Company seeks to deny his seat on the Board (Count Five); and asserts violations of Section 14A–6 for failure to timely file the proxy materials with the SEC within the proscribed time frames.

Under these counts, Plaintiffs seek:

(1) an order requiring EXTL to immediately amend its proxy solicitation to reflect the matters set forth in this Complaint and notifying its shareholders of the rescheduled annual meeting and to distribute said amended proxy statement to its record shareholders in sufficient time to allow said shareholders to vote their proxies at the June 30, 1995 shareholders meeting;

(2) preliminary and permanent injunction enjoining EXTL, and its officers, directors, agents, consultants and advisors from filing or disseminating any false or misleading proxy materials, or making any other untrue statements of fact to any shareholder of EXTL;

(3) For a preliminary and permanent injunction ordering EXTL, its agents, officers, directors, employees, consultants and advisors, to comply with the requirements of Section 14(a) of the Exchange Act and the rules and regulations promulgated thereunder;

(4) Directing that any proxies solicited or obtained by EXTL, its agents, servants, employees, affiliated and related persons or entities and by all persons who are entities acting in concert or participation with EXTL, as a result of or because of EXTL's misleading proxy statement materials shall be considered null, void and unenforceable;

(5) For a preliminary and permanent injunction directing EXTL, its agents, servants, officers, directors, employees and consultants to comply with all the terms and conditions set forth in the settlement agreements, and enjoining them from acting in any manner inconsistent with the terms thereof;

(6) That this Court appoint a Special Master to effectuate the terms of the Settlement Agreements and to maintain the *status quo* pending the annual shareholders meeting;

(7) For an Order compelling EXTL to hold its meeting on June 30, 1995 at 10:00 A.M. in New York City;

(8) For all attorneys' fees and costs of this action incurred in connection with this action; and

(9) For such additional and further relief as the Court deems just and proper.

The final itemization of alleged deficiencies of the Proxy Statement includes the following:

(a) In its transmittal letter, EXTL represents to its shareholders that Plaintiffs herein have "attempted to take control of Executive TeleCard for reasons that can

only be attributed to greed. The majority of their 'concerns' either never existed or were well along to being addressed by the Company, and the restructured EXTL which exists today was well into the planning stages before their costly attack." The foregoing representation violates Rule 14a–9 in that it directly or indirectly impugns character, integrity or personal reputation. Moreover, the aforesaid transmittal letter and the proxy materials fail to inform EXTL's shareholders that the Company entered into a valid, binding settlement with Plaintiffs herein which was ratified by EXTL's Board of Directors at its January 31, 1995 board meeting, which provided for an alternative slate for election to the Board of Directors.

(b) On page 6 of its proxy materials, EXTL represents that "the SPC Summary of Terms also allows for an additional payment over $600,000 by the Company to the company controlled by Mr. Krauth's financial adviser, Lee McClurkin." Lee McClurkin is not now nor has he ever been "Mr. Krauth's financial advisor". Moreover, the Krauth settlement agreement provides that TeleCard's new board of directors "will review the Providence Agreement to determine whether any additional payments are due thereunder ..." The settlement agreement contains no agreement, either express or implied, to pay any additional monies to Providence. Therefore, the aforesaid representations are false and misleading.

(c) Throughout its proxy materials, EXTL represents that "no such definitive Settlement Agreement or related documentation was ever executed by the Company or any purported representative of it." In fact, the Company executed valid, binding settlement agreements which it ratified at its board meeting on January 31, 1995, and thereafter reported the settlement both to the investing public and to the SEC in its Form 10–Q filed on February 21, 1995. Further, Corcoran and Engelman executed a Settlement Agreement and Mutual Release with Krauth.

(d) EXTL's proxy materials continue to propose Gerrity as a Director Nominee, and fails to include any of the New Board members as Director Nominees. In so doing, EXTL omits to inform the shareholders of its prior agreement to propose the New Board, and misrepresents that there is no binding agreement with Plaintiffs.

(e) EXTL's proxy materials fail to disclose that the staff of the NASDAQ stock market has commenced an inquiry relating to, among other things, certain of the events and circumstances relating to false and misleading proxy materials disseminated by EXTL, including Management's association with Bertoli. EXTL's proxy materials further fail to disclose that the NASDAQ stock market is considering, as a possible sanction, the delisting of EXTL's stock on its exchange.

(f) On pages 8 and 11 of its amended proxy materials, EXTL represents that Engelman "disclosed confidential information to and communicated with Richard Bertoli numerous times prior to the fall of 1994 using the alias "Ernie Schuck". The foregoing representation is false and misleading in that it implies that Engelman knowingly communicated with Bertoli, when, in fact, Bertoli's true identity actually was concealed from Engelman by Moore, Schuck and Gerrity. Upon learning of "Ernie Schuck's" true identity, Engelman consulted with an outside attorney to determine the effect of this deception. At no time did Engelman knowingly communicate with Bertoli in prison.

(g) The proxy materials are further misleading in that they fail to disclose that Bertoli, when interviewed by former counsel to the Special Committee at Allenwood Federal Penitentiary, advised that he had a personal relationship with Gerrity who visited him while incarcerated at the Allenwood facility and Union County New Jersey prison to "cheer him up".

(h) On page 36 of its amended proxy materials, EXTL represents that Bertoli "recently" was convicted of obstruction of justice and is incarcerated. The foregoing representation is false and misleading and is in violation of this Court's Order of October 21, 1994, in that it fails to disclose that Bertoli is a persistent securities law

violator who first was convicted of felony securities laws violations in 1978, and later was convicted in 1993 of obstruction of justice.

(i) On page 9 of its amended proxy materials, EXTL alleges that Krauth is known to have associated with convicted felons, as well as a variety of securities laws violators. This representation is based upon information supplied directly to EXTL by Bertoli, and the foregoing representations violate Rule 14a–9 in that it directly or indirectly impugns character, integrity or personal reputation. Furthermore, said allegation has been made in an attempt to detract attention away from the fact that EXTL's senior management regularly consulted with Bertoli concerning the corporation's most confidential and sensitive corporate matters.

(j) On page 9 of its amended proxy materials, EXTL represents that the Court "ordered that the SPC's application be withdrawn based on jurisdictional objections raised by the Company." The aforesaid representation is false in that no such order ever was entered.

(k) On page 9 of its amended proxy materials, EXTL represents that the SPC has failed to disclose that Theodore Mayer, John Nugent, Tom Walsh and Lee McClurkin allegedly have tried to take over TeleCard's Board, have traded in TeleCard stock, and that Mr. Mayer and Mr. Walsh have had "extensive business contacts" with Bertoli. However, none of these individuals is a member of the SPC, the foregoing representations are designed to confuse and mislead TeleCard's shareholders, and further violates Rule 14a–9 in that it directly and indirectly impugns character, integrity or personal reputation.

(l) On page 16 of its amended proxy statement, EXTL includes a statement regarding this Court's Opinion of November 22, 1994. However, EXTL fails to disclose to its shareholders that the Company was held in contempt of Court due to the mailing of the so-called "Newsletter" after entry of the Court's October 21 Order.

(m) In its amended proxy materials, EXTL fails to disclose that its stock has been delisted by the Philadelphia Stock Exchange because the proxy materials previously issued by Management were "false and misleading". Consequently, EXTL's amended proxy statement fails to disclose the basis for the delisting of its stock by the Philadelphia Stock Exchange.

(n) On page 10 of its amended proxy materials, EXTL alleges that Carl Corcoran failed to investigate financial improprieties of EXTL. In fact, EXTL has prevented an investigation into said financial improprieties by terminating Messrs. Engelman and Mell, and by excluding Corcoran from a position of authority within the corporation after he raised concerns to Gerrity, who advised him to not investigate too deeply.

(o) In its amended proxy materials, TeleCard fails to disclose that Network Data Systems ("NDS"), which is controlled by William Moore, has liquidated large blocks of TeleCard stock over the past two years, and that many of the aforesaid sales in late 1993 and early 1994, upon information and belief, were placed by Richard O. Bertoli, acting through Stuart Dounn, with the physical stock certificates delivered at Bertoli's direction by Dounn to Wien Securities. Further, the sales since October 1, 1994 are part of a scheme by NDS to manipulate the price of TeleCard stock, and that NDS has experienced short selling profits from these trades in violation of Section 16 of the Exchange Act. Further, NDS has either paid the retainer fee for EXTL's current legal counsel, or has lent money to EXTL for the purpose of retaining counsel.

(p) On page 6, the proxy materials reflect that "No such definitive Settlement Agreement or related documentation was ever executed by the Company or any purported representative of it." This statement is false as a "Settlement Agreement and Mutual General Release" was executed by Corcoran, as the then Chairman and Engelman, as the then President and COO, on behalf of EXTL, with Krauth as of March 3, 1995.

(q) On page 7, the proxy materials are misleading when they state that Gerrity

opposes the Krauth Summary of Terms and the SPC Summary of Terms without disclosing that he voted in favor of same at the January 31, 1995 board meeting after moving the matter for a vote.

(r) On page 9 of its amended proxy materials, TeleCard states "by this proxy, the Company proposes to end all of the litigation between Mr. Krauth, the SPC and the Company by putting it to the stockholders of the Company, rather than by private agreement with select shareholders, the determination of who should sit on the board, representing the interests of the stockholders and directing the future operations of the Company." It is false and misleading and said representations violate Rule 14a–9 in that it fails to disclose that EXTL has previously entered into Settlement Agreements with the Plaintiffs for an agreed upon slate of members for election to the Board of Directors to be voted upon by the shareholders.

(s) On Page 17 of the amended proxy materials, EXTL states that "On January 23, 1995 and January 25, 1995, the Court signed Orders, voluntarily prepared and submitted by counsel for Mr. Krauth and the SPC dismissing, respectively, Krauth I and Krauth II with prejudice." No such Order ever was entered with respect to Krauth I. The effect of this misrepresentation is to imply that the Orders entered in Krauth are no longer binding on EXTL.

(t) On page 23 of its amended proxy materials, EXTL represents that "Mr. Engelman is a member of the slate of directors proposed by Mr. Krauth and the SPC". This representation is false, because Mr. Engelman was originally proposed by EXTL as a director nominee in its December 30, 1994 proxy.

(u) On page 18 of its amended proxy materials, EXTL represents that "Mr. Corcoran failed to investigate alleged financial improprieties involving the Company ..." This representation is false, because Mr. Corcoran did try to investigate, but was prevented from doing so by the Bertoli Clique.

(v) On page 17 of its amended proxy materials, EXTL represents that its Spe-

cial Committee, through "independent counsel", has concluded that the settlement agreements are "not in the best interests of the shareholders of the Company", and thus should not be implemented. EXTL omits to inform its shareholders that 1) De Martino, prior "independent counsel" to the Special Committee, has testified that the settlement agreements are valid and binding, and were ratified at EXTL's board meeting on January 31, 1995, and 2) that Mr. Gerrity, the chair of the Special Committee, voted in favor of the agreements at the January 31, 1995 board meeting and moved the Board to vote in favor of ratification.

(w) EXTL has failed to disclose that De Martino resigned as counsel to the Special Committee, indicating his belief that the Special Committee "has became merely a facade ..."

(x) EXTL has failed to disclose that on March 1, 1995, its counsel filed with the United States District Court for the Southern District of New York a "Joint Motion to Vacate Judgment and Opinion", wherein it represents that the parties have entered into a settlement agreement, attached a copy of the February 15, 1995 "Settlement Agreement—Summary of Terms" with the representation that the document memorialized "the material terms of the settlement", and that "the parties have agreed that a further proxy statement will be disseminated to the shareholders of Executive TeleCard, Ltd. announcing a combined slate of nominees for election to its board of directors, which proxy statement shall be reviewed and approved by plaintiffs and their counsel prior to its dissemination."

(y) In its June 12, 1995 proxy materials, Telecard asks its shareholders to vote for its "six director nominees", but only identifies five such nominees, which will cause further confusion among Telecards' shareholders, especially in light of the representation that Richard Krinsley, a nominee in the May 24, 1995 proxy, has "retired."

(z) In its May 24, 1995 and June 12, 1995 proxy materials, TeleCard represents that the materials are being disseminated "By Order of the Board of Directors." In

fact, TeleCard's Board has not met nor voted its approval for the dissemination of the aforesaid materials.

## FACTS

### Management at EXTL

Effective December 7, 1994, William V. Moore ("Moore"), the President of EXTL and Chairman of its Board, resigned. Corcoran was appointed Chairman of the Board and Chief Executive Officer of the Company on December 16, 1994.

The current Board of Directors is composed of Edward J. Gerrity, Jr. ("Gerrity"), Anthony Balinger ("Balinger"), Robert N. Schuck ("Schuck"), Stig Sonnerberg ("Sonnerberg"), Corcoran and Daryl Engelman ("Engelman").

Gerrity has been Chair of the Board since March 17, 1995 and Chair of the Independent Committee consisting of himself and Sonnerberg. He has been a Director of the Company since its inception in 1987.

Schuck, a current Director, is also Vice President of EXTL.

Balinger has been acting Chief Executive Officer and President of EXTL since March or April 1995.

Engelman was the President and Chief Operating Officer of the Company from late December 1994 or early January 1995 until April 25, 1995 when he was dismissed by the Board. Engelman remains a director of the Board. He and Corcoran were on the Independent Committee of the Board. Engelman was removed from that Committee on April 25, 1995. Sonnerberg replaced Corcoran as a member of the Special Independent Committee when Corcoran resigned that office on March 29, 1995. That Committee is now made up of Sonnerberg and Gerrity.

### Inquiry By the Exchanges

On November 2, 1994 and November 8, 1994 EXTL received letters from the Philadelphia Stock Exchange concerning the October 21 Opinion of this Court. The Company did not answer the letters and effective January 3, 1995 the Philadelphia Exchange delisted EXTL. The Proxy Statement discloses the fact of the delisting, but not the full circumstances.

On November 11, 1994 Karen A. Tustin ("Tustin"), the Director of NASDAQ Market Services sent a letter to Schuck, as Vice President and Secretary, requesting:

> ... a detailed response regarding the release of [the October 21 Opinion] ... [including] a description, including dates, of all correspondence, telephone conversations, meetings, visits, etc., between Bertoli and [EXTL] representatives ... [Please provide a description of Bertoli's present and past relationships ... with EXT and its officers, directors and significant shareholders; ... A statement as to Bertoli's share ownership, direct and indirect, in [EXTL] ...

> This request is made in accordance with Part II, Section 3(c) of Schedule D of the NASD By–Laws which states that the Association may request any additional information or documentation, public or non-public, deemed necessary to make a determination regarding a security's ... continued inclusion ...

> If upon review, it is deemed that violations of the standards outlined in Section D ... have occurred, the NASDAQ Stock Market may take appropriate action necessary....

Tustin sent another letter on December 14, 1994 to Mr. De Martino, legal counsel to the Independent Committee asking for additional information and for some information outstanding from the November 11 letter.

De Martino responded to NASDAQ in a letter dated January 5, 1995.

### The Settlement Agreements

On November 17, 1994, an Action by Unanimous Written Consent of the Board of Directors of EXTL created a Independent Committee of the Board of Directors ("Independent Committee" or "Special Committee"), comprised of Corcoran and Gerrity, the independent directors, and charged it with the responsibility of investigating the allegations made by the Plaintiffs in prior litigation, and in a number of class actions filed in late 1994 primarily relating to certain relationships between EXTL officers and directors and Richard O. Bertoli ("Bertoli").

In the November 17 Unanimous Written Consent, the Independent Committee and each of its members was empowered to 1) determine the manner in which the Corporation shall respond to Plaintiffs' claims; 2) whether the corporation should discontinue its opposition to Plaintiffs' actions; 3) take any other steps necessary or appropriate to implement its investigation and to carry out any legal cause of action it deems appropriate; 4) to authorize the public release of information; 5) to execute, on behalf of EXTL, "such agreements, covenants, guarantees, representations, certificates, filing materials or other documents ... which the Special Committee may, within its sole discretion, deem necessary or appropriate to give effect to the foregoing resolutions"; and 6) to retain legal counsel to advise the Special Committee. The Independent Committee retained Ralph V. De Martino, Esquire ("De Martino") and the law firm of De Martino, Finkelstein, Rosen & Virga, to assist it in carrying out its responsibilities.

Settlement discussions began between the SPC and the Company in November 1994, but later broke down. The Company filed its own proxy materials which were the subject of *Krauth II*. Settlement negotiations began again on or around January 13. They continued after the permanent injunction hearing on January 16, 1995.

During these negotiations, the De Martino law firm represented the Independent Committee, Willkie, Farr & Gallagher ("Willkie Farr") represented the Company, and Krauth was represented by Robert Eugene Altenbach ("Altenbach"). As the negotiations progressed, both firms participated in the preparation of various settlement documents. Starting on January 13, ominously enough a Friday, Corcoran on behalf of EXTL negotiated in Atlanta with Krauth on behalf of the SPC. An agreement was reached at the end of the following week, on January 20, which provided that EXTL would purge itself of its remaining officers tainted by the Bertoli connection, namely Schuck, its Executive Vice President, and Allen Mandel ("Mandel"), its Senior Vice President. In addition, EXTL agreed to close its Nanuet, New York office, which

housed John Gitlin, Harold Reisner and Stu Dounn. The agreement named a slate of six directors, Krauth, John Nugent ("Nugent"), Christopher Vizas ("Vizas"), Corcoran, Engelman and Fred A. Weismiller ("Weismiller"), and provided for the expenses incurred by the SPC.

On January 18, 1995, Plaintiff Krauth had elected to break ranks with the other two members of the SPC, and Plaintiffs Miller and Legere, and two agreements with EXTL were prepared, one for Krauth alone and one for SPC, the latter calling for expenses in the amount of approximately $550,000. The settlement also provided that Nugent would become the newly designated Chief Executive Officer, that the Company would rescind and cancel (or confirm to the extent that it had already done so) all options granted to the Board or management in stock of the Turks & Caicos subsidiary, and that the relationship between EXTL and one of its shareholders, Network Data Systems ("NDS"), the chairman of which was Moore, would be resolved. Once again, both law firms drafted the relevant Krauth settlement documents. The settlement was memorialized in a document entitled "Settlement Agreement—Summary of Terms" which was executed by Krauth, in his individual capacity, and by Corcoran and Gerrity, then members of the Independent Committee, on behalf of EXTL on January 20.

Plaintiffs' counsel wrote the Court on January 20, 1995, informing the Court that the litigation would be dismissed with prejudice pursuant to a settlement agreement between the parties and the dismissal was entered as a court order on January 23. Pursuant to the letter both *Krauth I* and *Krauth III* were closed.

After executing the Krauth settlement agreement, EXTL, at Corcoran's direction, issued a press release on January 23, 1995 which stated that the Company had "agreed in principle upon the terms of a settlement of the pending litigation initiated by Krauth (to the extent that it involves Krauth) and Krauth's involvement in the proxy contest regarding the Board of Directors of EXTL. In addition, Krauth has withdrawn from the shareholder committee and John Nugent and

Christopher Vizas, both participants in the proxy contest brought by the dissident committee, consented to serve as members of EXTL's slate of nominees". An article appeared in the Wall Street Journal concerning the same subject the following day.

At some point during the week of January 23, the parties agreed to increase the amount that Krauth would receive to $200,000 rather than the $100,000 originally discussed. Another change in the Krauth agreement was made at the suggestion of De Martino during the week.

On January 26, 1995, Nugent and EXTL entered into a consulting contract whereby Nugent would be paid to "perform work consisting of developing certain actions and plans deemed necessary to ready the Company for a clean fiscal end and cut-off at March 31, 1995. This activity shall include reviewing corporate structure and other matters identified by the Company." This agreement was in anticipation of Nugent's becoming CEO.

Also on January 26, 1995, Schuck sent a letter to Corcoran demanding that he call a special meeting of the Board of Directors. The text of that letter was as follows:

RE: Board of Directors Meeting

Dear Carl,

I have had an opportunity to review the proposed settlement agreement with the remainder of the Dissident Shareholders Group, other than Walter Krauth, and spoken with DeMartino briefly regarding the settlement. I have a concern that the proposed settlement agreement with the other dissidents may not, in fact, be in the best interest of the company for many reasons. It would appear prudent that the full Board of Directors meet to consider not only possible settlement with the remaining Dissidents, but also review where we are in the proxy contest and what alternatives are available to the Company.

I am requesting therefore, that you call a special meeting of the Board of Directors for next week to discuss and consider not only the subject of any settlement with the remaining Dissidents, but also to review the proxy contest generally and that no further action be taken to settle with the Dissidents pending that meeting.

Corcoran scheduled a Board meeting at the Westchester Country Club for the afternoon of January 31, 1995. He also contacted EXTL's former Chairman, William V. Moore ("Moore") to enlist his support in explaining to Schuck and the other Board members the importance of the settlement with both Krauth and the SPC. Moore scheduled a meeting at the Admirals Club at LaGuardia Airport the morning of January 31. Moore, Schuck, Corcoran, Mandel, and Gerrity attended.

Later that afternoon, the Special Meeting of the Board of Directors was held at the Westchester. All board members were present, along with De Martino. Schuck was the secretary of the meeting. The agenda for the January 31 board meeting included approval of the settlement agreement with Krauth and with the SPC.

The Board considered the Summary of Terms relating to *both* the Krauth and the Miller/Legere settlements, which were attached as Exhibits "A" and "B" to the agenda and which differed materially only as to the amounts reimbursable.[3] At the time consents to Exhibit B had not been obtained from Miller and Legere. Upon a motion made by Gerrity, Corcoran, Engelman and Gerrity voted in favor of a resolution adopting the two agreements, Schuck voted against and Mandel abstained. Consequently, the resolution passed, and the corporation resolved that the Summary of Terms "be and hereby are authorized, approved, ratified and affirmed in every respect ..." The final sentence of both Exhibits contained the following language: "The foregoing has been agreed to by the undersigned as of [blank line for date], 1995 subject to the preparation and execution of the definitive Settlement Agreement and related documentation:"

**3.** The $200,000 approved in the Agreement with Krauth alone is included in the $700,000 in the Agreement with the SPC.

The resolution further stated that "the members of the Special Committee, and each of them, are authorized and directed to execute and deliver, for and on behalf of the Corporation, a Settlement Agreement in such form and containing such terms as contemplated by the Krauth Summary of Terms, together with such modifications of such terms and collateral and additional agreements and documents as may be recommended by counsel to the Special Committee . . .", and further the Special Committee was authorized to continue negotiations with the remaining members of the Shareholders Protective Committee, and to thereafter "execute and deliver, for and on behalf of the Corporation, upon negotiation of the remaining terms of such agreements, the SPC Summary of Terms, the settlement agreement contemplated by the SPC Summary of Terms, together with such modifications of such terms and collateral and additional agreements and documents as may be recommended by counsel to the Special Committee . . . the execution of such SPC Summary of Terms, the Settlement Agreement . . . by such members of the Special Committee, or either of them, to be conclusive evidence of their authority hereunder."

Although the minutes confirming that the resolutions were approved were never ratified by the Board, for reasons shortly to be set forth, they reflect the credible evidence of what happened at the meeting, prepared as they were by De Martino while still serving as counsel to the Independent Committee. The agreements which were submitted to the Board are annexed hereto as Appendices A and B and are the Agreements in Principle.

Although a subsequent dispute on the issue arose, based on the documentary evidence, and the most credible testimony, it is found that no objection was made by any of the Board members regarding notice of the January 31 meeting.

4. An agreement between the SPC and Providence Financial Advisors, signed by Lee McClurkin, of Provident, and Altenbach for the SPC, signed in August 1994, provides for:

   1. An initial retainer of $25,000;
   2. A monthly advisory fee of $5,000 . . .
   3. Success fees:

Thereafter, Corcoran and De Martino continued negotiations with counsel for the SPC to finalize certain terms of the Agreements in Principle. Miller, Legere, and Corcoran for EXTL, in his capacity as Chairman and member of the Independent Committee signed the "Settlement Agreement—Summary of Terms" on February 15, 1995. This agreement, as did Exhibit B, contained a provision for payment of "a maximum of $700,000 to reimburse Krauth and other SPC members . . ." [4]

EXTL issued another press release on February 17, 1995, which was reviewed by both the Willkie Farr and the De Martino law firms and by Corcoran, prior to its distribution to the public.

This press release, which was captioned "Executive Telecard Agrees in Principle to End Proxy Contest and Settle Litigation with Dissident Group", represented to the investing public that the parties "have agreed in principle upon the terms of a settlement of the pending proxy contest and litigation between them involving the Board of Directors of EXTL . . ." It also represents that the Company has agreed to pay approximately $730,000 in cash and stock to cover expenses incurred by SPC members and announces the New Board not including Weismiller.

On February 20, 1995 EXTL, acting through Mandel, filed its Form 10–Q with the Securities and Exchange Commission. In this public report, EXTL represents to the Securities and Exchange Commission and the NASDAQ Stock Market ("NASDAQ") that the proxy litigation was dismissed on January 23, 1995, with prejudice, "pursuant to an agreement of the parties".

In its 10–Q, EXTL describes and represents the "agreement of the parties" as follows:

   A. Providence shall ask that the Board of Directors proposed by the Group to consider paying the following success fees . . . :
   (i) in the event that the transfer of shares from the Turks and Caicos company is abrogated, $200,000.
   (ii) in the event the current Board of EXTL is replaced, $400,000. . . .

*Item 4—Submission of Matters to a Vote of Security Holders*

On January 20, 1995, Walter K. Krauth, Jr., a member of the EXTL Shareholders Protective Committee (the "Shareholders Committee"), withdrew from further association or participation in the Shareholders Committee and agreed in principal with the Company upon a settlement of the pending litigation initiated by Krauth against the Company (to the extent it involves Krauth) and Krauth's involvement in the proxy contest regarding the election of the Company's Board of Directors. In addition, Krauth and John H. Nugent, the shareholders Committee's nominees to become interim President of the Company, and Christopher Vizas, one of the Shareholder Committee's director nominees, each consented to serve as members of the slate of nominees to be proposed by the Board of Directors of the Company.

Krauth's withdrawal from the Shareholders Committee and the agreement of Messrs. Krauth, Nugent and Vizas to be included on the Company's slate of nominees was conditioned upon certain agreed upon terms including, among other things, a reconstituted slate of nominees to the board of directors to include Carl J. Corcoran, Daryl Engelman (already a Board member), Fred A. Weismiller (a Company nominee in its previous proxy solicitation) and Messrs. Krauth, Nugent and Vizas; settlement by the Company and Krauth of all litigation between them, including delivery of mutual general releases; payment by the Company of certain legal fees and other costs and expenses; indemnification and certain other corporate actions. Attached hereto and incorporated herein by reference in its entirety is a copy of the Company's Press Release issued January 23, 1995.

In addition, on February 15, 1995 the Shareholders Committee agreed in principle with the Company to a settlement of the pending litigation initiated by it against the Company and to a settlement of the proxy contest on substantially similar terms as the settlement with Krauth with respect to the reconstituted slate of nominees to the board of directors, settlement of the litigation, mutual general releases, indemnification and the like. The Compa-

ny has agreed to pay approximately $730,-000 in cash and stock toward the expenses incurred by present and former members of the Shareholders Committee (including Krauth) and their representatives during the proxy contest. Attached hereto and incorporated herein by reference in its entirety is a copy of the Company's Press Release issued February 17, 1995.

EXTL further disclosed and represented to the Securities and Exchange Commission and NASDAQ that the settlement would have an impact upon the company's liquidity and capital resources because "the terms of that settlement require the company to pay approximately $730,000 in cash and stock ($430,000 of which is required to be paid in cash on or before August 15, 1995)."

At some time between February 15 and February 20, it was determined that Weismiller would not serve as a member of the Board.

De Martino, Corcoran and Krauth finalized a Settlement Agreement and Mutual General Release, which was executed by Krauth and by Corcoran on behalf of EXTL on March 3, 1995 which reiterated the terms of the agreements submitted to the Board of Directors on January 31, but provided that EXTL would nominate Weismiller's successor and that this agreement would constitute the final agreement. The "subject to" provision was dropped.

On March 8, 1995, Nugent and Engelman, as CEO, signed an agreement that extended the January 26 consulting contract to ninety days instead of the original 60 days.

On March 10, 1995 the Board met again and the March 3 agreement was presented to the Board. Gerrity switched his vote from the January 31 meeting and joining Mandel and Schuck, outvoted Engelman and Corcoran by a 3–2 vote. The Board voted that it was not in the best interest of the Company to proceed with the Agreements in Principle with Krauth and the SPC.

On March 10, during a recess in the board meeting, Engelman signed a waiver of the confidentiality clause in Nugent's consulting

contract and later terminated Nugent's contract with EXTL.

Corcoran stepped down as Chair of the Board shortly after the March 10 meeting and resigned from the Independent Committee on March 29, 1995.

### Proxy Statement

In its proxy statement EXTL gives notice that the Annual Meeting of Stockholders (the "Meeting") will be held on June 30, 1995 for the purpose of electing six directors to the Board.

In addition, this 44–page single-spaced statement, with 10 pages of attachments, includes the following sections: Solicitation, Voting and Revocation; six pages entitled "Background Information Concerning this Proxy Statement," which describes the Settlement of Terms and this and other litigations involving the proxy contest; "Proposal One: Election of Board of Directors" describes the Company's slate; another seven pages dedicated to a description of the current litigations involving the company; six pages describing the current board members, policies, committees and renumeration; "Beneficial Ownership of Securities,"; several sections describing compensation and insider participation, current management, and a Report of the Stock Option Committee; "Proposal Two: Ratification of Selection of Independent Public Accountants,—one page on page 41; and a few pages on the other procedural and corporate matters.

### The Supplemental Proxy Statement

The Supplemental Proxy Statement was sent to shareholders on June 12, 1995. It corrects "typographical" errors in the earlier statement, informs shareholders of the most recent litigation between the parties and recommends an election of "Six Director Nominees Listed in the May 24, 1995 Proxy Statement: Edward J. Gerrity, Jr., Anthony Balinger, Stig Sonnerberg, David Warnes and Ebrahim Ali Abdul Aal."

### CONCLUSIONS

### The Court has Jurisdiction in This Case

In *United Paperworkers International Union v. International Paper Company,* 985 F.2d 1190 (2d Cir.1993), the Court of Appeals recently reaffirmed that individual shareholders have standing to challenge false and misleading proxy statements under 14a–9. In *United Paperworkers,* the Court stated that the right to sue is a right of:

all shareholders who are entitled to vote, not just for those who sponsor proposals, the right to make decisions based on information that is not false or misleading. *Cf.* Statement of Informal Proposals for the Rendering of Staff Advice with Respect to Shareholder Proposals, Exchange Act Release No. 12,599, 41 Fed.Reg. 29,989, 29,-990 (1976) (indicating agency view that private suit even to compel company to submit shareholder proposal to shareholders may be instituted by "the proponent, or any shareholder for that matter").

The *Borak* Court found that implicit in § 14(a)'s broad remedial purposes, which include promotion of the free exercise of the voting rights of stockholders and the protection of investors, was the availability of judicial relief where necessary to achieve that result. 377 U.S. at 432, 84 S.Ct. at 1559. We see no sound basis for denying a right of action to any shareholder who seeks to remedy the issuer's misleading statements in or omissions from proxy materials circulated in connection with a matter submitted for shareholder vote.

Accordingly, we conclude that the Union as a shareholder has standing to bring this suit.

*Id.,* at 1198

In so deciding, the Court rejected the argument that only the Sponsors of a proposal described in proxy materials should have standing to sue. The Court rejected the suggestion stating that "[s]ection 14(a) of the 1934 Act was enacted in the congressional belief that '[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange.'" *Citing J.I. Case Co. v. Borak,* 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964) ("Borak"). *Id.* at 1197.

Consistent with the conclusions reached below, the Court finds that the proxy materials distributed by EXTL on May 24, 1995 and June 12, 1995 violate the Exchange Act.

While not all the alleged deficiencies are material, there are colorable claims, some of which, after four days of hearings, are resolved in Plaintiffs' favor. The motion to dismiss the complaint is denied, consistent with the findings of Security Act violations.

■ Additionally, the Court has jurisdiction to hear the § 14a–6 claims regarding timeliness of SEC filings. *See Maywalt v. Parker & Parsley Petroleum Co.*, 808 F.Supp. 1037 (S.D.N.Y.1992) (Court recognized a private right of action under § 14a–6 when the claim under § 14a–6 violation is asserted in concert with a general § 14(a) violation). The filing of a revised proxy statement with accurate information should meet the concerns that are validly raised in the § 14a–6 claims.

■ Federal courts have supplemental jurisdiction over state law claims relating to a federal action provided that the "entire action before the court comprises but one constitutional 'case,'" and the federal and pendent claims "derive from a common nucleus of operative fact" such that a plaintiff "would ordinarily be expected to try them in one judicial proceeding." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). *See Greenblatt v. Delta Plumbing and Heating Corp.*, 818 F.Supp. 623, 629–30 (S.D.N.Y. 1993). If the *Gibbs* test is met, the claims are part of one constitutional case; "assuming substantiality of the federal issues, there is power in federal courts to hear the whole [case] ..." *Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138; *See Huffman v. Hains*, 865 F.2d 920, 922 (7th Cir.1989).

The claims in this case were all inextricably and exhaustively interwoven. This was apparent at the beginning of the hearings and became clearer as time progressed. It is in the interest of justice and finality to resolve the state claims as supplemental to the federal ones.

## I. *Preliminary Injunction Motion is Granted in Part and Denied in Part The Standard for Injunctive Relief*

■ Ordinarily, in order for preliminary injunctive relief to issue, a movant is required to show:

irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits of its claims to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor.

*See Jackson Dairy Inc. v. Hood*, 596 F.2d 70, 72 (2d Cir.1979); *International Banknote Co. v. Muller*, 713 F.Supp. 612, 618 (S.D.N.Y. 1989).

■ If an application for a preliminary injunction, in fact, seeks substantially all the relief that a plaintiff ultimately seeks, a more stringent standard of proof is required. *See White Directory, Inc. v. Rochester Tel.*, 714 F.Supp. 65, 67 n. 3 (W.D.N.Y.1989); *See also SEC v. Unifund Sal*, 910 F.2d 1028, 1039 (2d Cir.1990).

Moreover, to obtain an injunction the party seeking the relief must also establish that the threat of irreparable injury is likely without the requested relief. *See International Banknote*, 713 F.Supp. at 618.

■ Irreparable injury results from the use of false and misleading proxies when the free exercise of shareholders' voting rights will be frustrated. *J.I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1980). If the deficiencies with the proxy statement alleged by the Committee were to meet the standard of materiality below, then the threat of irreparable harm will follow.

### *Standard of Materiality*

The Committee must satisfy the standard of materiality with respect to the deficiencies it asserts.

Rule 14a–9 of the Securities Exchange Commission (SEC), False and Misleading Statements, states: "No solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in light of the circumstances under which it is made, is false and misleading with respect to any material fact, or which *omits* to state any material fact necessary in order to make the

statements therein not false or misleading. . . ." (emphasis added).

In *TSC Industries v. Northway*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), the Supreme Court set forth the standard for materiality, holding that "an omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."

The simplest way to address the materiality of the alleged deficiencies is to address them one at a time. Those alleged deficiencies that are determined to be material and where the facts support the likelihood of success on the merits will require clarification in amended materials.

A company need disclose only material facts. *Kahn v. Wien*, 842 F.Supp. 667, 678 (S.D.N.Y.1994) ("proxy solicitations need only provide the full objective facts upon which investors can make their own judgments" *citing Rodman v. Grant Foundation*, 608 F.2d 64, 72 (2d Cir.1979)). Where, as here, there is a dispute, the securities laws require disclosure of the disputed facts and possible outcomes. *Management Assistance, Inc. v. Edelman*, 584 F.Supp. 1021, 1032 (S.D.N.Y. 1984); *Avnet, Inc. v. Scope Indus.*, 499 F.Supp. 1121, 1125 (S.D.N.Y.1980).

### Omission of Events Surrounding the Settlement Agreements Violate Section 14A

Consistent with the finding below that there were valid agreements that were breached by EXTL and given the excruciating detail with which the company describes the agreement in the proxy statement, the materials are misleading only in that they fail to acknowledge certain of the circumstances underlying the agreement and its breach.

The failure of the Company to reveal that a general release had been executed with Krauth pursuant to the Agreement in Principle reached on January 31 and failure to note the vote at the January 31 meeting were omissions which rises to the level of violation. While the Company was not required to relay every step taken between October 1994 and May 25, 1995, these two actions were material omissions in the con-

text of what would have appeared to any stockholder to have been a full briefing of the issues surrounding the agreements.

In addition, insofar as De Martino, as the original counsel for the Independent Committee, found the agreements binding, that should be disclosed.

### The McClurkin Recovery of Over $600,000 Is Not Material

The agreement between the SPC and McClurkin allowed for the possibility that Providence stands to collect $600,000 in success fee if Plaintiffs were to prevail in taking control of EXTL's Board and in successfully terminating the Turks and Caicos plan. Since no slate opposing the management nominees is currently proposed, this information is no longer material.

The purported SPC Summary of Terms document states in paragraph 2(v) that Providence Financial Advisors, Inc. is the "SPC's advisor related to the proxy contest." The disclosure appears proper, but immaterial.

### EXTL Need Not Disclose NASD Staff Inquiries

The statement of opinion in a proxy statement is not actionable under securities laws unless Plaintiffs are able to show that the opinion expressed did not reflect the considered judgment of the Company and was not honestly held, or that the expression of the opinion was intended to mislead the shareholders. *See Hahn v. Breed*, 587 F.Supp. 1369, 1379–80 (S.D.N.Y.1984); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 266 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994).

EXTL does not argue that delisting by NASD would be material. This does not appear to be certain or even likely at this time. Consequently, there is no need for EXTL to disclose the inquiries of this regulatory body.

It is well established that "Section 14 carries with it no formal requirement that predictions be made as to future behavior,

and indeed, they are discouraged." *Marks v. Lainoff*, 466 F.Supp. 301, 302–03 n. 1 (S.D.N.Y.1979); *See Reiss v. Pan American World Airways*, 711 F.2d 11, 13 (2d Cir. 1983). This principle is grounded in the concern that it might be just as misleading to investors to disclose contingent plans as it might be to fail to disclose such plans. *Shamrock Holdings, Inc. v. Polaroid Corp.*, 709 F.Supp. 1311, 1327 (D.Del.1989); *See Reiss v. Pan American*. These concerns are applicable in this circumstance. Unless and until there is further action from NASDAQ, such speculative actions need not be disclosed.

EXTL need not disclose things it does not know and its non-disclosure of the possibility of such action cannot form the basis of any claim EXTL under Section 14(a). *Kahn v. Wien*, 842 F.Supp. at 676 ("A proxy statement need not negatively characterize all the facts that are disclosed or expressly verbalize all adverse inferences from those facts").

### EXTL Must More Fully Describe Engelman's Communications With Bertoli Under the Alias, Ernie Schuck

■ Engelman learned in October 1993 that the person he knew as Ernie Schuck was in fact Richard Bertoli and after knowing this Engelman continued to disclose EXTL business information to Mr. Bertoli using the Ernie Schuck alias.

Engelman admitted these facts on deposition and that a January 1995 letter he and Corcoran wrote to EXTL shareholders falsely stated that he did not previously consult with Bertoli concerning EXTL business matters. What the materials fail to disclose, and what should be disclosed since the Company has deemed this information relevant, and since Schuck is a current Board member and is being retained by the Company, is that he and Robert Schuck participated in the "Ernie Schuck" charade.

### EXTL Properly Disclosed Management's Prior Consultations with Richard Bertoli

■ A section of EXTL's proxy materials is devoted to addressing management's consultations with Richard Bertoli. That disclosure states:

### Management Consultations with Richard O. Bertoli

Prior to November 1994, certain officers and directors of the Company regularly consulted and/or shared confidential documents and information with Richard O. Bertoli, who was recently convicted of obstruction of justice in connection with a criminal investigation involving allegations of violations of the securities laws, with respect to corporate and operations issues. Mr. Bertoli is presently incarcerated at the Allenwood Federal Prison Camp in Allenwood, Pennsylvania. Messrs. Moore, Schuck and Mandel have personal relationships with Mr. Bertoli. Mr. Gerrity is an acquaintance of Mr. Bertoli, having lived for many years in the same community as Mr. Bertoli. The Company no longer solicits the advice of or shares confidential information with Mr. Bertoli (*see* "Proxy Contest and Related Litigation" above). The Company is aware of no facts indicating that Mr. Bertoli, directly or indirectly, possesses a controlling interest in the Company or beneficially owns, directly or indirectly, five percent or more of the outstanding shares of the common stock of the Company.

The language in the proxy statement regarding Bertoli tracks the language of the December 12 order which required disclosure of the "consultation by certain directors and officers of EXTL with Richard O. Bertoli, a convicted felon, concerning confidential and pending corporate matters." This language and the numerous other references to Bertoli meets the requirements of earlier orders.

Despite the Plaintiffs' concern that this language is buried deep in the materials, there was no order requiring a specific location for the language. The numerous references to Bertoli throughout the proxy statement provides adequate disclosure.

### EXTL's Disclosure of Krauth's Past Associations with Convicted Felons and Securities Law Violators Including Richard Bertoli is not Material

■ EXTL makes extensive disclosure in its proxy materials concerning plaintiff

Krauth's association with convicted felons and securities laws violators:

> All of the disclosed members of the SPC (Messrs. Krauth, Miller and Legere) have had extensive personal and business contacts with Richard Bertoli. * * * As to Mr. Krauth personally, he has spoken with Mr. Bertoli a dozen or so times, met with him several times and owns approximately 2 million shares (about 10 percent) of the outstanding stock of Residual Corporation, one of the companies Mr. Krauth has alleged Mr. Bertoli indirectly controls. In addition, Mr. Krauth is known to have associated with fugitive from justice and twice convicted felon, Joseph Lugo, as well as Robert Hensberry, Henry Winkler, Jr., and Ciro Cozzolino, all of whom have lengthy histories of securities laws violations.

Although Plaintiffs have not contested the accuracy of these statements, they are not material to the shareholders vote at this time. The warning in the note that accompanies Rule 14a–9, states that one example "of what may be misleading within the meaning of this rule [is] ... Material which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations without factual foundation," 17 C.F.R. § 240.14a–9 (1994). *See Krauth*, 1994 WL 584556 at *7.

There is no showing that these accusations were considered by the Board at its March 10 meeting which reversed its prior decision. It is worth noting also that these associations are entirely different than the consulting and sharing of corporate confidential documents with an incarcerated and twice convicted felon, that was the subject of the October 21 opinion. Since there is presently no proxy contest pending on behalf of the SPC, this information is gratuitous, among other things, and should be struck.

### The Description of the Withdrawal of Plaintiffs' Application to Vacate the Dismissal of Krauth II

The Court did enter an order concerning the withdrawal of plaintiff's application to vacate *Krauth II*.

The representation in the proxy material is adequate.

### EXTL Description of the Involvement of Messrs. Mayer, Nugent, Walsh and McClurkin in Plaintiffs' Proxy Efforts is not in Violation of the Securities Law

■ Plaintiffs also object to the disclosures in EXTL's proxy materials concerning the involvement of John Nugent, Lee McClurkin and Messrs. Mayer and Walsh in their proxy efforts because they claim that "none of these individuals is a member of the SPC."

The Court finds this irrelevant to the issues put before the shareholders at this time, particularly in the absence of a proxy contest.

### EXTL Properly Disclosed this Court's November 22, 1994 Opinion

■ EXTL's proxy materials include the following disclosure concerning this Court's November 22, 1994 Opinion:

> On that date [December 13, 1994], the Court also held that a newsletter sent to stockholders by the Company after October 21, 1994 amounted to a solicitation of stockholders concerning the then-scheduled January 5, 1995 meeting in violation of the Court's October 21, 1994 order (described above). As a result, the Court required the Company give notice of the December 13, 1994 order. Such notice has been given.

That EXTL described the Court's finding that its newsletter to shareholders was a "violation of the Court's October 21, 1994 order," rather than characterize it using the technical legal term of contempt of court is not a material misstatement. *Kennecott Copper*, 584 F.2d at 1200.

### EXTL Properly Made No Disclosure Concerning its Prior Listing on the Philadelphia Stock Exchange

■ Plaintiffs correctly point out that EXTL stock was previously listed on the Philadelphia Stock Exchange as well as NASDAQ, and that its stock has been de-listed from the Philadelphia Exchange. Plaintiffs have not proved that this that this de-listing was due to this Court's October 21, 1994 finding that the company's September 1994 proxy materials contained certain misstatements.

The Company need not disclose more about its delisting with the Philadelphia Exchange. The proxy statement sufficiently discloses the fact of the delisting and the nature of the inquiry that proceeded that act. Nothing further is required.

### EXTL Disclosure of The Conduct of Former Chairman Carl J. Corcoran is Not Misleading

Plaintiffs claim that EXTL alleges on page 10 of its proxy materials that "Carl Corcoran failed to investigate financial improprieties of EXTL." There is no such statement on page 10 of EXTL's proxy materials. Moreover, Plaintiffs' claim that "EXTL has prevented an investigation into said financial improprieties" is contrary to the facts clearly disclosed in EXTL's proxy materials.

EXTL's proxy materials do state that the Independent Committee of Independent Directors of EXTL's Board concluded, following an investigation into such matters, that Mr. Corcoran failed to investigate alleged financial improprieties concerning the company raised by Nugent in the following terms:

Mr. Corcoran failed to investigate alleged financial improprieties involving the Company he and Mr. Krauth claimed were discovered by a consultant to the Company, John Nugent, who was a supporter of Mr. Krauth and a nominee director under the Krauth Summary of Terms and the SPC Summary of Terms.

Proxy at 17–18.

EXTL's proxy materials further clearly disclose that: "Upon investigation, the Independent Committee found such allegations were baseless" Plaintiffs have not made the requisite showing with regard to this allegation.

### EXTL Properly Disclosed Material Information in its Possession Concerning Network Data Systems, Limited

EXTL disclosed in its proxy materials that William Moore is the President, Chief Executive Officer, and a director and shareholder of NDS, that NDS has both bought and sold EXTL stock in substantial quantities and that such purchases and sales may have given rise to certain claims by EXTL against NDS under the federal securities laws, and that NDS has been alleged to have been indirectly controlled by Richard Bertoli.

The disclosures by EXTL on these matters, including Mr. Moore's position at and stock holdings in NDS, and his former positions at EXTL) include the following statements:

Pursuant to an agreement between the Company and NDS dated March 27, 1995 (the "Settlement Agreement"), NDS has granted to the Company an irrevocable proxy to attend general and special meetings of the stockholders of the Company with full power to vote all of the Company's shares beneficially owned or controlled by NDS in favor of the Director Nominees proposed by the Board. The Settlement Agreement resolved certain claims and potential claims by and between the Company and NDS arising out of the purchase and sale of Company stock by NDS. (The Company had previously from time to time entered into negotiated transactions for the sale of shares of its restricted common stock to NDS at prices at or below the market prices quoted by NASDAQ.) Pursuant to the Settlement Agreement, NDS agreed to pay the sum of $350,000 to the Company and not to compete with the Company or solicit Company employees for three years.

Richard Bertoli and his family have been alleged to hold a controlling interest in NDS and Residual, with whom Mr. Moore is affiliated, through various nominee companies. Mr. Moore has denied those allegations. The Company has nevertheless obtained irrevocable proxies from NDS and Residual, in part, in order to avoid the possibility or appearance of influence on the Company by Mr. Bertoli.

EXTL claims it has no knowledge of alleged sales of NDS stock by Richard Bertoli "through Stuart Dounn, with the physical stock certificates delivered at Bertoli's direction by Dounn" or any alleged "scheme by NDS to manipulate the price of EXTL stock." EXTL made no disclosures concerning Mr. Bertoli's alleged actions through Mr. Dounn because disclosure of matters one knows nothing about is not required under

Section 14(a) of the Exchange Act. *Avnet, Inc.,* 499 F.Supp. at 1125.

EXTL did disclose the allegations of stock manipulation made against NDS because such allegations have been made in several of the class action lawsuits brought against the company recently. Plaintiffs have not met their burden to show that the disclosures are insufficient.

### EXTL Properly Disclosed the Fact That Edward J. Gerrity, Jr. Currently Opposes The Purported Settlement

■ EXTL's proxy materials properly and fully disclose all material facts concerning Gerrity's present position that the purported settlement agreements are not in the best interests of EXTL's shareholders and the basis for Mr. Gerrity's position in that regard. In so far, as the breach found by the Court above, must be disclosed, any omissions describing Gerrity's old position are immaterial.

### EXTL Properly Disclosed the Fact That its Proxy is Designed to Put to the Shareholders the Decision of Who Will Sit on the Board

EXTL's proxy materials makes the following disclosure:

By this Proxy, the Company proposes to end all of the litigation between Mr. Krauth, the SPC and the Company by putting to the stockholders of the Company, rather than by private agreement with select shareholders, the determination of who should sit on the Board, representing the interests of the stockholders and directing the future operations of the Company. It is the unanimous belief of the Board (including the Independent Committee), Mr. Krauth and the SPC that it is in the best interests of the Company and its stockholders to put an end to the diversion of management time and limit the mounting costs resulting from the prior proxy contest and related litigation.

Proxy at 9.

Plaintiffs properly assert that this passage is improper because it does not include a statement that the view of Krauth and the SPC was based upon the Agreements in

Principle. Because the breach of those agreements must be disclosed, this point is moot.

### EXTL Properly Disclosed the Fact That Krauth I and Krauth II Were Dismissed by Plaintiffs with Prejudice

Plaintiffs' objection—that EXTL's proxy materials incorrectly disclose that *Krauth I* and *Krauth II* were dismissed by plaintiffs voluntarily with prejudice is not sufficiently supported.

On January 20, 1995, plaintiffs' counsel, Peter J. Anderson, Esq., wrote a letter to this Court which stated as follows:

RE: *Krauth, et al. v. Executive TeleCard, Ltd.;* Docket No. 94–CIV–7337(RWS)

*Krauth, et al. v. Executive TeleCard, Ltd.;* Docket No. 94–CIV–0106(RWS)

Dear Judge Sweet:

Please be advised that the above cases involving proxy litigation have been dismissed with prejudice pursuant to Settlement Agreement among the parties.

That letter enclosed a copy of the Notice of Dismissal, which the Court so ordered on January 23, 1995. Krauth I was closed on January 26, and Krauth III was closed on January 27, 1995.

### Failure to List the Six Directors Names in the June 12 statement is a Material Omission

■ A significant purpose of the upcoming shareholder's meeting in this election of the directors. Given the centrality of the slate, and the potential for confusion based on the extensive description of non-candidates in the initial proxy statement, it is a material omission even if by way of typographical error to fail to list Krinsley's name in the June 12 statement.

### Appropriate Remedies

As this court has done in the past, it will enjoin EXTL from soliciting proxies until it has fully disclosed those matters which it indicated above require disclosure.

■ The Committee has also asked that proxies received to date for the Company be invalidated. Since stockholders can revoke

proxies prior to the meeting by the issuance of a new proxy, no further sanitation other that fully disclosed information, is required.

## II. *EXTL Breached the Agreements with Krauth and the SPC*

### 1. The Agreements in Principle are Enforceable Contracts

Defendants argue that the Agreements in Principle submitted to the board in the January 30 meeting are not binding contracts. An analysis of preliminary agreements such as this one begins with the Honorable Pierre N. Leval's opinion in *Teachers Ins. & Annuity Assoc. v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y.1987). *See also Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69 (2d Cir.1989); *Weinreich v. Sandhaus*, 850 F.Supp. 1169, 1177 (S.D.N.Y.1994).

In *Tribune Co.*, Judge Leval held that even preliminary contracts may be binding in at least two situations:

> One occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation. Such an agreement is preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement. The second stage is not necessary; it is merely considered desirable. As the Court of Appeals stated with respect to such preliminary agreements in *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969), "the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event ..."

670 F.Supp. at 498.

Judge Leval then described a second circumstance where a preliminary agreement may be binding:

> The second and different sort of preliminary binding agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated. Although the existence of open terms generally suggests that binding agreement has not been reached, that is not necessarily so. For the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an attempt to reach final agreement within the scope that has been settled in the preliminary agreement.

*Id., citing Sommer v. Hilton Hotels Corp.*, 376 F.Supp. 297 (S.D.N.Y.1974)

In the instant case, the agreements are of the first type, a binding preliminary agreement. The Second Circuit considers four factors in determining whether such an agreement exists. *See Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985); *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75–76 (2d Cir.1984). The factors are:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing. *Winston*, 777 F.2d at 80.

The Second Circuit has at various times stated that "[n]o single factor is decisive, but each provides significant guidance." *R.G. Group*, 751 F.2d at 75. *See also Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 576 (2d Cir.1993). But the Second Circuit has also stated, in the context of a binding preliminary commitment, that the first factor is the most important. *Arcadian Phosphates*, 884 F.2d at 72. *See also Argonaut Ins. Cos. v. Medical Liab. Mut. Ins. Co.*, 760 F.Supp. 1078, 1083 (S.D.N.Y.1991). Similarly, in cases involving binding preliminary agreements, the same importance should be placed on what the specific writing in question provides.

The first factor weighs in favor of the Plaintiffs. The Settlement of Terms provide that "[t]he foregoing has been agreed to by the undersigned as of _____ 1995 subject to the preparation and execution of the definitive Settlement Agreement and related doc-

umentation," but there is no language in the agreements that *expressly* reserves the right not to be bound in the absence of a final writing.

In contrast, contracts that were found not to be binding preliminary agreements contained provisions indicating that the contract was not intended to govern in the absence of a complete agreement. *See, e.g., Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir.), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984) (drafts that provided "when executed and delivered, this [agreement] will be a valid and binding agreement" indicated no intent to be bound until the execution of a formal contract); *R.G. Group*, 751 F.2d at 76 (explicit wording of franchise agreement that declared "when duly executed" prevented a finding that parties intended to be bound prior to such execution).

It is not apparent that either party ever indicated any express reservation of the right not to be bound in the absence of a writing. Rather, in the press releases, the Form 10–Q filed by the Company with the SEC, and the joint motion to this Court, EXTL represented that it had entered into a settlement agreement with the Plaintiffs [5]. In *Arcadian Phosphates*, 884 F.2d at 72, the Court of Appeals allowed that in addition to writings, the parties agreement that the agreement is binding can be used to test the first factor. *See, e.g. Teachers Ins. & Annuity Assoc. v.*

*Butler*, 626 F.Supp. 1229, 1232 (S.D.N.Y. 1986). While in *Butler* the admission was overt, in this case the actions of the parties, particularly in their joint submission to this Court is strong indication of their intent to be bound. Moreover, this agreement was executed on behalf of the Company by Corcoran and Gerrity, and was approved by the corporation's Board of Directors at its January 31 meeting. It would contravene the intention of the parties to find now that there was no agreement. The first factor favors plaintiff in this case.

The second factor, whether there has been partial performance of the contract, also weighs in favor of the Plaintiffs. Neither party disputes that the parties agreed to a voluntary dismissal of the earlier actions in reliance of these agreements. Consistent with the Settlement of Terms, a general release containing the same terms as the Agreements in Principle and without the "subject to" language was executed for Krauth on March 3. The Board took action with regard to the Residual and NDS contracts (provisions 3 and 4) [6], the current proxy statement proposes new accountants (provision 5), the role of Schuck was changed was altered and counsel has represented that he will not remain at EXTL (provision 7), neither Schuck or Mandel are running for reelection [7] (provision 8), press releases were made by the company announcing the agree-

---

**5.** Because EXTL's Form 10–Q, filed with the SEC on February 21, 1995, was statutorily mandated, it is strong evidence that an agreement between the parties had been reached to settle the proxy litigation.

Form 10–Q is a quarterly report pursuant to Section 13, 15 U.S.C. § 78m, or 15(d), 15 U.S.C. § 78o, of the Securities and Exchange Act of 1934. As such, a company that makes false statements within it may be subject to civil and criminal liability under the act. Securities and Exchange Act of 1934, §§ 18, 32; 15 U.S.C. §§ 78r, 78ff.

In *Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon Ltd. Partnership*, 840 F.Supp. 770, 778 (D.Or.1993), the Court held that defendants were estopped from disputing the accuracy of the Form 10–Q it had filed with the S.E.C. because it was a "statutorily mandated admission." Other courts have held that while not conclusive, statements made to the S.E.C. are evidence of a status of an agreement. *See Hagerman v. Yukon Energy*

*Corp.*, 839 F.2d 407, 411 (8th Cir.1988), *cert. denied*, 488 U.S. 820, 109 S.Ct. 63, 102 L.Ed.2d 40 (1988) (prospectus filed with the S.E.C. was evidence that could be used to establish that the parties had agreed to modify their agreement).

After EXTL mentioned its Form 10–Q that it had entered into a agreement with Krauth and the SPC, at the very least, the Plaintiffs reliance on the agreement's validity was reasonable. The 10–Q does not bind the company from changing its mind, but it does indicate that in February the Company believed that an agreement existed and was authorized.

**6.** These provision numbers correspond to the agreement between EXTL and the SPC that was attached to the joint motion submitted to this Court.

**7.** Contrary to the Agreements, Gerrity is on the slate.

ments [8] (provision 10); and at the very least, the Board has discussed closing the Nanuet office. (provision 11). Most significantly, the parties applied jointly to this Court to vacate its October 21, 1994 Opinion (provision 13) and represented to the Court that an agreement had been reached. *See R.G. Group*, 751 F.2d at 75 ("partial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect").

The position that there has been no partial performance of the contract is also contradicted by the disclosures contained within its Form 10–Q and its press releases. For example, in its SEC filing, EXTL represents as follows:

1. "Judge Sweet signed Orders dismissing the above-captioned action ... with prejudice, pursuant to agreement of the parties.";

2. Walter Krauth, Jr., ... withdrew from further association or participation in the shareholders committee ...

Further evidence of partial performance is provided by Telecard's press release issued on February 17, 1995, which represents the following:

1. "All present and former members of that committee have agreed to support the revised slate of nominees for election to Telecard's board ...";

2. "Both lawsuits brought by the shareholders committee have been dismissed."

In addition, the settlement agreement provides that John Nugent would become Telecard's CEO. In anticipation of assuming that role, Mr. Nugent was hired by Telecard as a consultant in January, 1995, and remained in that position until his contract was terminated in mid-March, 1995.

The third factor, whether or not the terms of the alleged contract have been agreed upon, weighs in favor of Plaintiffs. The Form 10–Q filed with the SEC represents terms of the agreement that are consistent with those provided for in the signed settlement of terms and the press releases.

Additionally in their joint Motion to Vacate Judgment and Opinion, the parties represented to the Court that "on February 15, 1995, a "Settlement Agreement—Summary of Terms" was executed, memorializing the material terms of the settlement." The agreement referred to in the Motion contains the same terms as the agreement signed by Miller, Legere and Corcoran. This factor weighs in favor of enforcement.

The fourth factor is not particularly meaningful in this context, the agreements are in a writing. Furthermore, according to De Martino's deposition, he as the Independent Committee's prior counsel believed that they had structured an agreement which is binding upon the Company.

In sum, upon consideration of the four factors, a binding preliminary agreement was reached.

Alternatively, the agreements are enforceable under principles of promissory estoppel because both parties relied on the validity of the agreements.

"In New York, promissory estoppel has three elements: ' "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reasons of his reliance." ' " *Arcadian*, 884 F.2d at 73, *quoting Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co.*, 804 F.2d 787, 793 (2d Cir.1986), quoting Restatement (Second) of Contracts § 90 (1981); *accord, Bergner v. Martinez*, 823 F.Supp. 151, 160 (S.D.N.Y.); *Zucker v. Katz*, 708 F.Supp. 525, 533 (S.D.N.Y.1989); *Triology Variety Stores, Ltd. v. City Products Corp.*, 523 F.Supp. 691, 699 (S.D.N.Y. 1981); *Swerdloff v. Mobil*, 74 A.D.2d 258, 427 N.Y.S.2d 266 (2d Dep't), *appeal denied*, 50 N.Y.2d 913, 409 N.E.2d 995, 431 N.Y.S.2d 523 (1980); *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 99 A.D.2d 522, 471 N.Y.S.2d 299 (2d Dep't), *aff'd*, 63 N.Y.2d 449, 472 N.E.2d 992, 483 N.Y.S.2d 164 (1984).

---

8. These press releases were not joint, but were by EXTL.

■ Here, all three elements are present with regard to both settlement agreements. On or about January 19, 1995, Krauth and both members of the Independent Committee signed the Settlement Agreement—Summary of Terms. This agreement sets forth in clear and unambiguous language "the agreed upon summary of the material terms of a Settlement Agreement related to the settlement of all outstanding litigation and disputes involving Executive Telecard, Ltd." On the same day, De Martino, in negotiation with Peter J. Anderson, counsel for the remaining members of the SPC, reached an agreement in principle settling those issues related to the litigation.

Even if the Settlement Agreements—Summary of Terms do not spell out all the terms of the agreements, the Court may still find clear and unambiguous promises based on the Summaries of Terms. In *In re Crazy Eddie Securities Litigation*, 714 F.Supp. 1285 (E.D.N.Y.1989) (Nickerson, J.), the court held that a "Memorandum of Understanding," which, like the Summaries of Terms here contained details of the proposed settlement, did not merely express clear and unambiguous promises, but constituted an enforceable agreement. The Court explained:

> The Understanding is not an "agreement to agree" unenforceable for vagueness. It is an agreement in principle spelling out in detail the terms and conditions of an anticipated settlement. Although it requires in good faith the parties to "attempt in good faith to agree upon and execute an appropriate stipulation of settlement," it explains what the terms of that settlement are to be.

*Id.* at 1295. As in *Crazy Eddie*, the Summaries of Terms set out sufficient terms of the Definitive Settlement Agreements to in themselves constitute enforceable agreements. In the least, the Summaries of Terms spell out clear and unambiguous promises to the Plaintiffs.

Second, reliance by Krauth and the SPC was reasonable and foreseeable. This conclusion is based on the discussion above regarding the second *Winston* factor. Moreover, the series of statements issued by EXTL in the Form 10–Q and press releases are further evidence that "reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Heckler v. Community Health Services of Crawford*, 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984).

Third, it is clear that Krauth and the SPC suffered injury by reason of their reliance on TeleCard's promises. They ceased prosecuting their proxy contest and their efforts to elect a Board of Directors they wanted. This ultimately has lead to a series of actions which may hopefully be terminated by this disposition.

In sum, the Court finds that there was an agreement and that it was breached by EXTL. The terms of the Agreements in Principle are those that are annexed to this opinion, which are the same, save the dollar amounts, as those in the agreement attached to the joint motion submitted to the Court, described in the 10–Q, and agreed to in the Release executed between Krauth and the Company on March 3.

■ Finally, it must be determined if final injunctive relief is appropriate after balancing the equities for enforcing new slate of directors provision of the contract. *See Smithkline Beckman Corp. v. Proctor & Gamble Comp.*, 591 F.Supp. 1229, 1235 (N.D.N.Y.1984), *aff'd* 755 F.2d 914 (2d Cir. 1985); *New York State NOW v. Terry*, 704 F.Supp. 1247, 1262 (S.D.N.Y.), *aff'd but modified on other grounds*, 886 F.2d 1339 (2d Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990).

Under the present peculiar circumstances, Plaintiffs have failed to establish a balancing in their favor. Given the current status of the company, with four new directors proposed, Krauth at war with much of current management, and the possibility that much of the harm done can be compensated through a monetary award, the Court cannot grant specific performance with regard to enforcement of the slate of directors provided for in the Agreements in Principle, Weismiller being no longer available. Since the composition of the board changed after the March 10

reversal of position, it would be a futility to enforce the provision contained in the March 3 release granting the present board the power to select the sixth member. The other provisions of the agreements, including damages, can be resolved at a later time.

To impose the slate agreed to under the Agreements in Principle, would not only be futile but would trample on the fiduciary duty of the current board.

Since the current slate of directors is not the slate agreed to by the Board of Directors at its January 31 meeting, nor is it the slate described in the Summary of Terms documents signed by Krauth and the Independent Committee on January 20 and Legere, Miller and Corcoran on February 15, nor is it the slate submitted to this Court on March 1 in the joint motion, which included Weismiller, no enforceable slate is in existence.

Therefore, while Plaintiffs have met their burden in terms of the breach, the balancing of the equities in this case does not support an injunction with regard to enforcing specific performance of the Agreements in Principle.

Nor does the Court find that the appointment of a Special Master is appropriate at this juncture. The Plaintiffs have not supported adequately the need for such a remedy.

### Conclusion

Upon the findings and conclusions stated above, Plaintiffs' motion for a preliminary injunction is granted in part and denied in part. The Company must issue a revised proxy statement consistent with this Opinion.

It is so ordered.

### EXHIBIT A

#### Summary of Terms

For purposes of this document, Executive TeleCard, Ltd. shall be referred to as "EXTL;" Walter K. Krauth, Jr. shall be referred to as "Krauth;" John H. Nugent shall be referred to as "Nugent;" and Christopher Vizas shall be referred to as "Vizas".

1. EXTL's Board of Directors, acting through the Special Committee, will prompt-

ly amend and refile proxy materials and commence a new proxy solicitation for the EXTL annual shareholders meeting, which shall be promptly rescheduled and notice thereof given to shareholders. The six nominees will be Messrs. Corcoran, Engelman, Krauth, Nugent, Vizas and Weismiller (the "New Board"). Each new director nominee will agree in writing that he will not operate or act at the direction or under the control of Richard Bertoli. Following the annual meeting the New Board will elect Mr. Nugent as Chairman of the Board and CEO and Mr. Engelman as President and COO.

2. EXTL and Krauth (i) will enter immediately into a settlement of all litigation between them and deliver mutual general releases; (ii) EXTL will agree to pay (or reimburse, as the case may be) Mr. Krauth's legal fees and other costs or expenses incurred in the proxy contest involving the EXTL Shareholders Protective Committee, incurred to date and related to the proxy contest limited to $200,000 (such payment to be subject to prior review and approval by EXTL and to be made within six months); (iii) Krauth will not take any action (including initiating or participating in a proxy contest) for five years to replace any EXTL director or to support any nominee to the EXTL Board in opposition to the New Board; (iv) Krauth and his associates will not take any action contrary to positions taken by EXTL in any litigation against EXTL; (v) EXTL will indemnify Krauth, Nugent and Vizas and their attorneys from claims asserted by current or former shareholders of EXTL for claims or causes of action arising out of the proxy contest involving the EXTL Shareholders Protective Committee and for claims arising out of the execution of the consent of which this is a part, to the fullest extent permitted by Delaware law.

3. EXTL will use its best efforts to obtain the execution by Network Data Systems Limited ("NDS") and by Residual Corporation ("Residual") of standstill agreements with EXTL providing that for five years each of NDS and Residual: (i) will not take any action (including initiating or participating in a proxy contest) to replace any EXTL director; (ii) will not support any nominees to

the EXTL Board in opposition to the New Board; and (iii) will not buy additional EXTL stock.

4. The New Board will promptly review the Management Agreement with Residual with a view to maximizing the potential for obtaining repayment of the loan from Residual and towards termination of the Management Agreement if such is found by the New Board to be in the best interest of shareholders.

5. EXTL's independent accountants will be replaced as soon as possible following the annual meeting by a national accounting firm acceptable to the New Board.

6. EXTL will rescind and cancel (or will confirm to the extent it has already done so) all options granted to the Board or management in stock of the Turks and Caicos subsidiary; and EXTL will represent and warrant that the once proposed spinoff of the Turks & Caicos subsidiary has been abandoned and that there is no proposal or plan on the part of EXTL's Board of Directors or EXTL's management to effect a partial or complete spinoff of the Turks & Caicos subsidiary. EXTL will take the necessary steps to cancel as many of the 550,000 shares issued in conjunction with such proposed spinoff as permissible by law so as not to render such entity undercapitalized or insolvent.

7. EXTL will agree to cause Mr. Schuck to either resign (or be terminated from) his positions with EXTL and will offer to engage Mr. Schuck at his current salary level to serve as consultant to EXTL on an "as needed" basis for an initial period of six months with EXTL having the right to extend such agreement for an additional two six month terms. EXTL will agree to cause Mr. Mandel to either resign (or be terminated from) his positions as an officer and director (but not as an employee) of EXTL effective no later than the annual meeting of shareholders. Other than as disclosed in EXTL's definitive proxy materials, the Board of Directors of EXTL has not authorized the execution of any employment agreements with any executive officer of EXTL and will agree

to promptly provide access to EXTL's books and records to Krauth, Nugent and Vizas.

8. Krauth, Vizas and Nugent and a majority of the current EXTL Board shall agree to take all necessary actions, including voting any shares held by them, to elect the New Board.

9. EXTL will close its Nanuet, New York offices as soon as practicable.

### EXHIBIT B

[Execution Copy]

### Settlement Agreement—
### Summary of Terms

The following constitutes the agreed upon summary of the material terms of a Settlement Agreement (the "Settlement Agreement") related to the settlement of all outstanding litigation and disputes involving Executive Telecard, Ltd. ("EXTL") and the EXTL Shareholders Protective Committee (the "SPC"):

1. EXTL's Board of Directors, acting through the Special Committee, will promptly amend and refile proxy materials and commence a new proxy solicitation for the EXTL annual shareholders meeting, which shall be promptly rescheduled and notice thereof given to shareholders. The six nominees will be Messrs. Corcoran, Engelman, Krauth, Nugent, Vizas and Weismiller (the "New Board"). Each new director nominee will agree in writing that he will not operate or act at the direction or under the control of Richard Bertoli. Following the annual meeting the New Board will elect Mr. Nugent as Chairman of the Board and CEO and Mr. Engelman as President and COO.

2. EXTL and SPC will immediately enter into a standstill agreement providing that: (i) all proxies previously solicited by EXTL or the SPC will be treated as of no further force and effect and null and void; (ii) the SPC and EXTL will immediately cease their current proxy solicitations; (iii) EXTL and the SPC and Theodore Mayer will enter immediately into a settlement of all litigation between them and deliver mutual general releases covering EXTL, all EXTL Board members, all SPC members and their respective offi-

cers, agents and representatives and Mr. Mayer; (iv) EXTL will reimburse legal fees, proxy solicitation and printing fees of the SPC and Walter K. Krauth, Jr. relating to the proxy contest, and amounts advanced by Mr. Mayer), up to a maximum of $700,000, as follows: (a) $400,000 to be paid in cash within six months of the date hereof, and (b) $300,000 to be paid by the issuance of 40,678 unregistered shares of common stock of EXTL; *provided, however,* that in the event EXTL conducts a closing pertaining to a public or private offering of its securities prior to the date six months after the date hereof, any unpaid portion of the $400,000 referred to in subpart 2(iv)(a) above shall become due and immediately payable in full; *provided, further,* that all payments, whether in cash or in stock, shall be made by EXTL to such person or persons as directed by _____, the sole party hereby designated by the SPC as authorized to give instructions regarding such payments; (v) the SPC, the members of the SPC and their associates will not take any action (including initiating or participating in a proxy contest) for five years to replace any EXTL director (except as contemplated by this Settlement) or to support any nominee to the EXTL Board in opposition to the New Board; (vi) the members of the SPC and their associates will not take any action contrary to positions taken by EXTL in any litigation against EXTL; (vii) the New Board will review the Providence agreement to determine whether any additional payment(s) are due thereunder; and (viii) EXTL will indemnify the SPC, its members, director nominees, attorneys and proxy solicitor, Georgeson & Co., from claims asserted by current or former shareholders of EXTL and arising out of the execution of this agreement or the Settlement Agreement contemplated hereby to the fullest extent permitted by Delaware law.

3. EXTL will use its best efforts to obtain the execution by Network Data Systems Limited ("NDS") and by Residual Corporation ("Residual"), within two weeks of the execution of this Summary of Terms, of standstill agreements with EXTL providing that for five years each of NDS and Residual: (i) will not take any action (including initiating or participating in a proxy contest) to replace any EXTL director; (ii) will not support any nominees to the EXTL Board in opposition to the New Board (except as contemplated by this Settlement); and (iii) will not buy additional EXTL stock.

4. The New Board will promptly review the Management Agreement with Residual with a view to maximizing the potential for obtaining repayment of the loan from Residual and towards termination of the Management Agreement if such is found by the New Board to be in the best interest of shareholders.

5. EXTL's independent accountants will be replaced as soon as possible following the annual meeting by a national accounting firm acceptable to the New Board.

6. EXTL will (or confirm to the extent it has already done so) rescind and cancel all options granted to the Board or management in stock of the Turks and Caicos subsidiary; and EXTL will represent and warrant that the once proposed spinoff of the Turks & Caicos subsidiary has been abandoned and that there is no proposal or plan on the part of EXTL's Board of Directors or EXTL's management to effect a partial or complete spinoff of the Turks & Caicos subsidiary. EXTL will take the necessary steps to cancel as many of the 550,000 shares issued in conjunction with such proposed spinoff as permissible by law so as not to render such entity undercapitalized or insolvent.

7. EXTL will agree to cause Mr. Schuck to either resign (or be terminated from) his positions with EXTL and will offer to engage Mr. Schuck at his current salary level to serve as consultant to EXTL on an "as needed" basis for an initial period of six months with EXTL having the right to extend such agreement for an additional two six month terms. EXTL will agree to cause Mr. Mandel to either resign (or be terminated from) his positions as an officer and director (but not as an employee) of EXTL effective no later than the annual meeting. Other than as disclosed in EXTL's definitive proxy materials, the Board of Directors of EXTL has not authorized the execution of any employment agreements with any executive officer

of EXTL and will agree to promptly deliver copies of all employment agreements between EXTL and its employees to SPC.

8. Insofar as Messrs. Gerrity, Schuck and Mandel have agreed not to stand for reelection as members of the Board of Directors at the Annual Meeting of Stockholders, EXTL will agree to examine all alternatives available to it in order to assist such persons in effecting the exercise of outstanding options which expire in 1995 and to implement such alternatives as it deems appropriate. The available alternatives include but are not limited to the amendment of EXTL's stock option plans as necessary to provide that outstanding options held by a director or key employee upon resignation or voluntary termination of service will terminate upon the later of the expiration date of such outstanding option or six months following resignation or voluntary termination of such service.

9. The SPC and a majority of the current EXTL Board shall agree to take all necessary actions, including voting any shares held by them, to elect the New Board and consummate the Settlement.

10. This Settlement will be promptly effected through the documentation described above; the parties shall issue a joint press release upon execution of the Settlement; SPC shall promptly amend its Schedule 13D to reflect the Settlement and EXTL will promptly file a Current Report on Form 8K to reflect the Settlement.

11. EXTL will represent and warrant that it plans to close its Nanuet, New York office; and that such termination will be effected within thirty (30) days of the date of the agreement contemplated hereby.

The foregoing has been agreed to by the undersigned as of January 20, 1995 subject to the preparation and execution of the definitive Settlement Agreement and related documentation:

EXTL SHAREHOLDERS PROTECTIVE COMMITTEE

By: _____
  Name:

By: _____
  Name:

By: _____
  Name:

EXECUTIVE TELECARD, LTD.

By: _____
  Name: Carl J. Corcoran
  Title: Chairman