James **LICHTENBERG** and John Bansbach, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**BESICORP GROUP INC.**, BGI Acquisition LLC, BGI Acquisition Corp., Michael F. Zinn, Melanie Norden, Michael J. Daley, Gerald A. Habib, Richard E. Rosen, Steven I. Eisenberg and Martin E. Enowitz, Defendants.

**No. 99 CIV. 1638 (WCC).**

United States District Court,
S.D. New York.

March 26, 1999.

---

**380**

Law Offices of Curtis V. Trinko, LLP, New York City (Curtis V. Trinko, Timothy J. MacFall, of Counsel), Goodkind, Labaton, Rudoff & Sucharow, LLP, New York City (Bernard Persky, Diane Zilka, of Counsel), Harold B. Obstfeld, P.C., New York City (Harold B. Obstfeld, of Counsel), for Plaintiffs.

Robinson Brog Leinwand Greene Genovese & Gluck P.C., New York City (David C. Burger, of Counsel), for Defendants.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

This purported class action on behalf of the minority shareholders[1] of Besicorp Group, Inc. ("Besicorp") is presently before the Court on the motion of plaintiffs James Lichtenberg ("Lichtenberg") and John Bansbach ("Bansbach") for a preliminary injunction enjoining violations of the federal securities laws in connection with the issuance of an allegedly misleading proxy statement soliciting shareholder approval of the Plan of Merger dated November 23, 1998 (the "Merger Plan"), by and among Besicorp, BGI Acquisition Corp. ("Merger Sub") and BGI Acquisition LLC ("Acquisition"). The Court has original jurisdiction over the action pursuant to the Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78n(a). The Court heard oral argument on the motion March 16, 1999. On March 18, 1999, we issued an Order granting in part and denying in part the relief sought, indicating that we would file this opinion shortly thereafter explicating our reasons for the Order.

### BACKGROUND

Besicorp and its Board of Directors issued a proxy statement on Securities and Exchange Commission ("SEC") Schedule 14D–1, dated March 1, 1999 (the "Proxy"). Plaintiffs allege that the Proxy contains materially misleading statements, as well as material omissions of fact, in violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Act"),[2] and implementing Rule 14a–9(a).[3] The alleged misrepresentations concern the Board's efforts, with the aid of Acquisition and Merger Sub, to structure the merger so as to terminate two shareholder derivative actions. Plaintiffs allege that defendants failed to disclose that a principal effect and purpose of

1. Comprised of all of the public shareholders excluding the defendants herein.

2. Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), provides: "It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of any national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."

3. 17 C.F.R. § 240.14a–9 provides: "No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting, or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

the merger was to insulate Besicorp's current and former Board of Directors, comprised of defendants Michael Zinn, Michael Daley, Melanie Norden, Gerald Habib, Richard Rosen, Steven Eisenberg, and Martin Enowitz (the "Director Defendants"), from any liability as a result of these derivative actions. In addition, plaintiffs allege that the Proxy fails to disclose the material financial impact of the termination of the derivative suits upon the merger consideration to be paid to the shareholders. As described more fully below, successful adjudication of the derivative actions would result in an increase of more than 40% in the merger consideration available for distribution to the public shareholders, from $37.09 per share to approximately $62 per share.

### I. *The Derivative Suits*

In March 1993, plaintiff Lichtenberg commenced a derivative action entitled *Lichtenberg v. Zinn, Enowitz and Eisenberg,* Index No. 93–1987 (Sup.Ct. Ulster Cty.) (the "Lichtenberg Action"), on behalf of Besicorp against defendants Zinn and former Besicorp directors Enowitz and Eisenberg (who, at that time, comprised the entire Besicorp Board of Directors). In that action, Lichtenberg alleges that Zinn, Eisenberg and Enowitz caused Besicorp to issue stock and warrants to themselves for little or no consideration, thereby breaching the fiduciary duties of loyalty and due care which they owed to Besicorp, as well as wasting corporate assets. In addition, Lichtenberg alleges that Zinn, Eisenberg and Enowitz caused Besicorp to engage in improper related-party transactions with Zinn, or Zinn-controlled entities, which also constituted a waste of corporate assets.

Specifically, Lichtenberg alleges that in December 1991, Besicorp's Board issued to Zinn a warrant for 350,000 shares of Besicorp common stock and 350,000 shares outright. In August 1992, Besicorp's Board of Directors issued another 285,000 shares to Zinn and 100,000 shares each to Eisenberg and Enowitz. Thus, between December 1991 and August 1992, Lichtenberg claims that Zinn, Enowitz, and Eisenberg improperly granted themselves approximately 1.2 million shares of Besicorp common stock (out of a resulting total of approximately 3 million outstanding shares) which, in addition to their prior holdings, gave Zinn, Eisenberg and Enowitz in excess of 51% of the ownership of Besicorp for little or no consideration. Lichtenberg also claims that Zinn, Eisenberg and Enowitz created a special litigation committee ("SLC") to assess the bases of these claims, but that Zinn orchestrated and personally controlled the operations of the SLC.

Prior to trial, Besicorp made a motion to dismiss and/or for summary judgment on the basis of the SLC's finding that the suit was not in the best interests of Besicorp. The trial court granted the motion and Lichtenberg filed a timely notice of appeal from that decision to the New York Supreme Court, Appellate Division, Third Department. Oral argument was heard on December 17, 1998, and the decision on appeal is presently pending.

The second derivative action concerns the actions of Besicorp and its Board with respect to a criminal proceeding against Zinn. In June 1997, defendant Zinn pled guilty to two felony counts for causing false statements to be filed with the Federal Election Commission and causing a false corporate tax return to be filed with the Internal Revenue Service in connection with illegal contributions made to the 1992 election campaign of Congressman Maurice Hinchey of New York. *United States v. Michael Zinn and Besicorp Group Inc.,* No. 97 Cr. 486 (S.D.N.Y.1997) (CLB). According to plaintiffs, these criminal convictions arose from a scheme devised and perpetrated by defendant Zinn to illegally funnel Besicorp corporate funds into Congressman Hinchey's 1992 election campaign. In connection with his guilty pleas, Zinn confessed that he solicited "campaign contributions" to the Hinchey campaign

from Besicorp employees by promising that those employees would be reimbursed by Besicorp through raises and bonuses. A number of Besicorp employees made such contributions and were reimbursed by Besicorp. Besicorp itself was prohibited by federal law from making campaign contributions.

Zinn's activities resulted in Besicorp's conviction on two related criminal charges and payment of a substantial fine. Zinn was fined $36,673 and sentenced to a six-month term of incarceration with a two-year term of supervised release thereafter. Upon his release from prison, he resumed his executive position as CEO, President and Chairman of the Board of the Company. Plaintiffs further allege that, in 1996 and 1997, Zinn and other defendants then constituting the Board, caused Besicorp to advance several hundred thousand dollars in legal costs to certain directors, officers, current and former employees and their spouses in connection with criminal proceeding.[4]

On August 8, 1997, plaintiff Bansbach commenced a derivative action in New York State Supreme Court entitled *Bansbach v. Zinn, Eisenberg, Habib, Rosen and Harris,* Index No. 97–2573 (Sup.Ct. Ulster Cty.) (the "Bansbach Action"). Bansbach seeks to hold Zinn, Daley, Habib, Harris and Rosen liable to Besicorp for all of Besicorp's legal fees and costs, the legal fees and costs advanced to Zinn for his defense of the criminal case, as well as the legal fees and costs advanced by the company for various Besicorp employees and their spouses. Bansbach also seeks reimbursement from Zinn for the fines imposed upon Besicorp in connection with the criminal proceedings, and damages for all harm to the company's reputation and goodwill resulting from the criminal proceedings and Zinn's criminal actions.

The defendants in the Bansbach Action moved to dismiss the complaint for failure to make a pre-suit demand on the Board of Directors. The trial court granted this motion, and Bansbach filed a timely notice of appeal from that decision to the New York Supreme Court, Appellate Division, Third Department. In a unanimous decision dated February 4, 1999, the Third Department reversed the trial court's dismissal of the Bansbach Action, holding that plaintiff had made sufficient allegations to show that making a pre-suit demand would have been futile because the Board was not truly independent. Proceedings in the Bansbach Action are now pending at the state trial level.

## II. *The Merger Transaction*

In July 1997, Besicorp entered into a Master Restructuring Agreement (the "MRA") with the Niagara Mohawk Power Corporation ("Niagara Mohawk") related to Besicorp's ownership interests in five power plants which provided power to Niagara Mohawk. In connection therewith, Besicorp received Niagara Mohawk common stock, valued at $69 million as of June 30, 1998, and net cash of $59 million.

The large capital gains realized by Besicorp in these transactions put it under great pressure to merge before the end of Besicorp's tax year (March 31, 1999) with a company having tax losses which could be applied to offset the gains. Thus, on November 23, 1998, the Besicorp Board of Directors entered into the Merger Plan with Acquisition and Merger Sub. Pursuant to this agreement, Besicorp would transfer its continuing businesses, as well as substantially all of the company's liabilities, to Besicorp, Ltd. ("Newco") (the "Spin–Off"). Besicorp would then authorize the pro-rata distribution of the common stock of Newco to the shareholders of Besicorp. The remainder of Besicorp's as-

---

**4.** Zinn had only reimbursed Besicorp for approximately $45,000 of that amount as of July 29, 1998. As part of the merger transaction, all amounts reimbursed to Besicorp by Zinn are being returned to him, the remaining debt with respect to these disbursements is forgiven, and Besicorp is to repay Zinn the full amount of the criminal fine assessed against him in connection with his guilty plea in the criminal action.

sets, which include, *inter alia,* the common stock received from Niagara Mohawk [5] and $59 million cash, would be retained by Besicorp.

Under the terms of the Merger Plan, Merger Sub would then be merged into Besicorp, and Besicorp would be the surviving company. On the effective date of the merger transaction, each share of Besicorp common stock which was issued and outstanding immediately prior to the effective date would be converted into the right to receive $34.50 in cash, plus an additional amount per share pursuant to a formula described in the Merger Plan if certain contingencies occurred. Under this formula, and based upon the trading price of Besicorp's common stock on the date the Proxy was issued, the shareholders would have the right to receive $37.09 per share. Pursuant to the terms of the Merger Plan, all issued and outstanding shares of Besicorp common stock would thereafter automatically be canceled. As a result of the merger, the present Besicorp shareholders would have no continuing equity interest in Besicorp, which would become a wholly-owned subsidiary of Acquisition, and there would cease to be a public market for the company's common stock. Defendants Zinn, Eisenberg and Enowitz would receive in excess of $44.5 million in merger consideration for the approximately 1.2 million shares of stock allegedly improperly issued to them.

Finally, the Merger Plan specifically contemplated the treatment of the company shares which were the subject of pending litigation between Besicorp and defendant Enowitz (the "Enowitz Action"). This lawsuit was brought by Besicorp to compel Enowitz to return 100,000 disputed shares of corporate stock in his possession to the company. Under the terms of the final Merger Plan, the merger consideration received for such 100,000 shares would be held in escrow pending a final

determination regarding Enowitz's right to the underlying stock. Besicorp would transfer the rights to any proceeds from that litigation to Besicorp's shareholders (the shareholders of Newco subsequent to the consummation of the merger). Under the terms of the Merger Plan, if it is ultimately determined that Enowitz was not entitled to the stock, and is therefore not entitled to the merger consideration for said stock, the merger consideration would be distributed on a pro rata basis to Newco's shareholders, including, of course, the Board of Directors. Thus, plaintiffs allege that Zinn and the Director Defendants preserved the Enowitz Action by transferring Besicorp's interest in such action to Newco, because of their significant financial interest in that lawsuit, but deliberately ensured that the Bansbach and Lichtenberg Actions (collectively the "derivative suits") could not be pursued by the plaintiffs, in order to eliminate their potential liability with respect to such actions.

On March 19, 1999, the vote was held with respect to the Merger Plan and the merger was approved. The merger was consummated on March 22, 1999.

### III. *Relief Sought in Motion for Preliminary Injunction*

Plaintiffs here allege that the Proxy is materially misleading with respect to its statements concerning the impact of the merger on the Bansbach and Lichtenberg Actions. In particular, plaintiffs complain that the Proxy fails to disclose that the merger will effectively terminate these actions and that successful adjudication of the Lichtenberg Action would result in defendants Zinn, Enowitz and Eisenberg returning 1.2 million shares of Besicorp common stock making an additional $44.5 million in merger consideration available for distribution to the minority shareholders. Such distribution would result in an increase in merger consideration from

---

**5.** Defendants indicated at oral argument that the Niagra Mohawk stock has been sold. To the extent that such stock has been sold, the assets will consist of the cash received therefrom.

$37.09 per share to approximately $62 per share, an increase of approximately 40%.

Plaintiffs further allege that the Proxy failed to disclose that successful adjudication of the Bansbach Action would result in the recoupment of more than $1 million dollars in legal defense costs and fines which the company paid in connection with the criminal convictions of Besicorp and defendant Zinn. Finally, plaintiffs allege that the defendants the Proxy should have disclosed the fact that the merger was intentionally structured to terminate the Bansbach and Lichtenberg Actions.

Based on these allegations, plaintiffs moved on March 9, 1999 for a preliminary injunction to enjoin the alleged violations of § 14(a) of the Act and for expedited discovery in connection with the issues presented. The Proxy vote was scheduled to take place on March 19, 1999 and, by the terms of the merger agreement, the merger had to be consummated by March 22, 1999 or else Besicorp would forfeit $1.4 million. On March 9, 1999, District Judge Pauley signed an Order to Show Cause granting plaintiffs' request for expedited discovery, and scheduling a hearing on the motion for a preliminary injunction on March 16, 1999.

At said hearing, plaintiffs requested an order directing that: (1) prior to the consummation of the merger, the Bansbach and Lichtenberg Actions be transferred to Newco as assets thereof in order to preserve these actions as assets of Newco pending final adjudication thereof; and (2) the merger consideration received for stock at issue in the Lichtenberg Action and the monies at issue in the Bansbach Action be held in escrow pending final adjudication of those actions and damages claims asserted herein. On March 18, 1999, we issued an Order granting in part and denying in part the relief sought, for the reasons discussed below.

## DISCUSSION

A party seeking a preliminary injunction must establish "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). "The purpose of a preliminary injunction is to preserve the status quo between parties pending a final determination of the merits." *See Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 143 F.3d 688, 692 (2d Cir.1998). Once the legal requirements for an injunction are met, this Court may exercise its equity jurisdiction to mold a decree to the necessities of the case. *See Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)

### I. Likelihood of Success on the Merits

Ordinarily, plaintiffs would only have to show that the probability of prevailing on the merits of their claims is greater than fifty percent. *See Eng v. Smith*, 849 F.2d 80, 82 (2d Cir.1988) (citation and quotation omitted). However, where the injunctive relief sought "does not merely maintain the status quo, but rather grants the movant[s] substantially all the relief [they] ultimately seek[ ]," the Court must apply "a more stringent standard." *Id.* Under such circumstances, the movants must show a "substantial" likelihood of success on the merits, (i.e., that their cause of action is "considerably more likely to succeed than fail"). *Id.* Although the relief requested by plaintiffs clearly seeks only to maintain the status quo, the granting of such relief would also provide plaintiffs with substantially all the relief which they ultimately seek. Therefore, in light of the extraordinary nature of the relief sought, we will apply the heightened standard to our review of the merits.

To establish a violation of Section 14(a) of the Act and Rule 14a–9, plaintiffs need only show that the Proxy contained a

material misrepresentation, either in the form of an affirmative statement or an omission. *See Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Negligent misrepresentation is sufficient—plaintiffs need not plead or prove scienter. *See Wilson v. Great American Indus., Inc.,* 855 F.2d 987, 995 (2d Cir.1988); *see also Gerstle v. Gamble–Skogmo, Inc.,* 478 F.2d 1281, 1301 n. 20 (2d Cir.1973). However, if scienter were a necessary element of plaintiffs' claim, it is clearly present here, because it seems impossible to conceive of an innocent reason why defendants chose to take from plaintiffs their standing to pursue the derivative actions against them and confer it instead on an acquiring company which has professed no interest in pursuing them.

■ If the misleading Proxy has or will imminently cause injury to plaintiffs, they may seek monetary or injunctive relief. *See J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (recognizing private cause of action for violations of § 14(a) of the Act).

■■ As a threshold matter, plaintiffs must establish the objective materiality of the alleged misrepresentations. An omission or misleading statement of fact is said to be material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Plaintiffs need not prove that disclosure of the omitted fact would cause a shareholder to change his vote—just "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable [shareholder] as having significantly altered the 'total mix' of information made available." *Id.* The objective fairness of the terms of the merger is irrelevant.

Plaintiffs contend that the Proxy was materially false and misleading because it failed to adequately describe: (1) the amount of money at stake in the derivative suits; (2) the impact of the merger on the derivative suits; (3) the potential difference in merger consideration received by the minority shareholders as a result of the elimination of the derivative suits; and (4) the certainty and amount of the financial windfall to the officers and directors involved as a result of the termination of the suits. Plaintiffs further contend that the Proxy was misleading because it failed to disclose that the merger was intentionally structured in such a way (specifically, the failure to assign the contingent assets/liabilities of Besicorp's interest in the derivative actions to Newco) so as to benefit the defendant officers and directors by virtue of the premature termination of the actions and not for a legitimate corporate purpose. Plaintiffs thus argue that the representation of the Board that the merger is fair to and in the best interests of the shareholders is false and misleading.

### A. Description of the Derivative Suits

■ The Proxy includes a brief description of the Lichtenberg and Bansbach Actions under the heading "Legal Proceedings." With respect to the Bansbach Action, the Proxy states the name, venue and current procedural status of the suit. The nature of relief sought is then described as follows:

> The Plaintiff sought to hold such persons liable to Besicorp: (a) for all sums advanced to or on behalf of Mr. Michael F. Zinn in connection with his defense of the Proceeding; (b) for all sums advanced to or on behalf of Mr. Michael Daley, who was subpoenaed for information in connection with this matter; (c) for all legal expenses, costs and fines incurred by Besicorp itself in connection with the Proceeding; (d) for all harm to Besicorp's reputation and goodwill resulting from the Proceeding; (e) for punitive damages; and (f) for plaintiff's attorneys' fees, costs and expenses.

Although the precise amounts paid by Besicorp for the items in categories (a) through (c) were known at the time the

Proxy was drafted, those figures are not included in the description of the suit.[6] Indeed, the generalized description gives no indication whatever of the value of the suit.

Rule 14a–9 prohibits the use of proxy materials "containing any statement, which at the time and *in the light of the circumstances under which it is made,* is false or misleading with respect to any material fact." (emphasis supplied). In light of the fact that the merger was going to result in the termination of this derivative suit, it is highly likely that the omission of any indication of the potential value of the suit would be considered material. In other words, there is a substantial likelihood that the disclosure of the fact that shareholders would be forever barred from recovering approximately $1 million dollars by voting in favor of the cash-out merger would have been viewed by the reasonable shareholder as having significantly altered the 'total mix' of information made available.

Similarly, the Proxy discloses only the most general information with respect to the Lichtenberg Action. It states that the plaintiff is seeking "an accounting and the return of assets to Besicorp" but fails to quantify this in terms of the amount of stock at issue, namely 1.2 million shares. The potential value of this suit was in no way speculative in that the merger provided for the precise cash-out value per share. The Proxy failed to disclose that the successful adjudication of the claims in the Lichtenberg Action would result in the return of 1.2 million shares to the company, and that the cancellation of these shares would make an additional $44.5 million (approximately $25 per share) in merger consideration available for distribution among the minority shareholders. In light of the fact that shareholders would be forever barred from recovering an addi-

tional 40% in merger consideration as a result of the termination of the derivative suit caused by the structuring of the merger, it is beyond any dispute that the omission of this information would be considered material.

Defendants argue that they are not required to give detailed information with respect to the relief sought in the derivative suits because § 14(a) of the Act and Rule 14a–9 do not require speculative disclosures. The cases cited by defendants, however, do not support this proposition. *Mendell v. Greenberg,* 927 F.2d 667, 677 (2d Cir.1990), *modified on other grounds,* 938 F.2d 1528 (2d Cir.1990) held only that a proxy need not disclose incidental personal tax benefits that may ensue for a major shareholder as a result of a merger as such were both "trivial" and "speculative" in nature. Here, we are not dealing with a possible tax benefit to defendant Zinn, but rather a 40% increase in merger consideration to be received by the minority shareholders, the opportunity for which was *certain* to be foreclosed in the event the merger were consummated.

*General Elec. Co. v. Cathcart,* 980 F.2d 927 (3d Cir.1992) is also inapposite. There, the court held that, in proxy statements soliciting approval of "raincoat provisions" (i.e., corporate governance rules designed to protect directors and officers from personal liability), directors were not required to disclose the potential for future litigation arising from directors' alleged misconduct—only pending or threatened litigation. Here, plaintiffs argue that the Proxy should have included more detailed information with respect to the relief sought in existing derivative actions.[7] Further, the quantitative information at issue was known to the defendants and was not in the least extent "speculative" in nature.

---

6. The Court does not suggest that the defendants should have estimated the amount of damages or attorneys' fees and costs that could have been awarded in the action as such would be purely speculative.

7. As noted above, the Bansbach Action has been reinstated in Supreme Court, Ulster County, and dismissal of the Lichtenberg Action is on appeal to the Appellate Division, Third Department.

Finally, the Proxy itself proves that defendants' argument in this respect is disingenuous. Immediately following the description of the Bansbach and Lichtenberg Actions is a description of the Enowitz Action brought by Besicorp against Martin Enowitz, a former director and executive officer of Besicorp, seeking a determination that Mr. Enowitz "is not entitled to the 100,000 Disputed Shares" which Besicorp claims Mr. Enowitz was obligated to resell to Besicorp when he left the employ of the company. The Proxy expressly states that "[t]he Merger Consideration for such shares amounts to approximately $3,450,000, subject to upward (but not downward) adjustment as provided in the Plan of Merger." The Proxy also details how the merger consideration for such shares shall be held in escrow pending resolution of the dispute and that:

> [i]f it is determined that Mr. Enowitz was not entitled to the Disputed Shares, Besicorp's shareholders will receive, on a pro rata basis, such monies less Besicorp's costs (estimated to be less than $100,000) to repurchase such shares.

This is precisely the type of information that plaintiffs argue should have been included with respect to the Lichtenberg and Bansbach Actions. Clearly, defendants did not feel that the information was too speculative or trivial with respect to the Enowitz Action.

### B. *Impact of Merger on the Derivative Suits*

The Proxy makes several references to the impact of the merger on the Bansbach and Lichtenberg Actions. Following the brief summary of the actions, the Proxy notes that: "The Plaintiffs in the Bansbach and Lichtenberg Litigation may not [be] able to maintain their actions as shareholder derivative suits if the merger is consummated."[8] This statement is affirmatively misleading because the word "may" implies a possibility that the plaintiffs will be able to continue the actions as shareholder derivative suits. Under New York law, it is well-established that after a cash-out merger such as that contemplated here, whereby the plaintiffs cease to be shareholders in the surviving corporation, plaintiffs lose standing to maintain a derivative action. *See Friedman v. Mohasco Corp.*, 929 F.2d 77, 79 (2d Cir.1991) (after cash-out merger, "plaintiffs lack standing to assert derivative claims"); *Silverman v. Schwartz*, 248 A.D.2d 332, 670 N.Y.S.2d 95 (1st Dep't 1998); *Bronzaft v. Caporali*, 162 Misc.2d 281, 616 N.Y.S.2d 863 (N.Y.Sup. 1994); *Rubinstein v. Catacosinos*, 91 A.D.2d 445, 446, 459 N.Y.S.2d 286 (1st Dep't), *aff'd*, 60 N.Y.2d 890, 458 N.E.2d 1247, 470 N.Y.S.2d 570 (1983).[9] Upon consummation of the merger, all holders of Besicorp common stock, including Bansbach and Lichtenberg, will cease to have any equity interest in Besicorp. Therefore, as a matter of law, Lichtenberg and Bansbach will lose their standing to maintain the derivative actions.

The intention of Acquisition (the sole shareholder of the surviving company) with respect to the further prosecution or dismissal of these actions is irrelevant.[10]

---

**8.** Similar statements are included in the opening summary (i.e., "The consummation of the Merger may adversely effect certain shareholder derivative lawsuits"), and under the heading "Interests of Executive Officers and Directors in the Merger" (i.e., "As a result of the consummation of the Merger, the plaintiffs in such suits will cease to be shareholders which may adversely affect their ability to maintain such suits").

**9.** Delaware courts recognize an exception to this rule if the sole purpose of the merger is to deprive shareholders of standing to bring or maintain derivative suits. *See Scattergood v. Perelman*, 945 F.2d 618, 626 (3d Cir.1991). However, there is no indication that New York courts would recognize such an exception and, even if they did, this case would not fall within the exception because defendants have come forward with evidence of a tax benefit of the merger.

**10.** As noted in the Proxy, Acquisition has repeatedly acknowledged that it has no inten-

Upon consummation of the merger as planned, the respective courts before whom the actions were pending would have to dismiss the actions sua sponte because they would lack subject matter jurisdiction to adjudicate the claims. *See, e.g., Eaton Assocs., Inc. v. Egan,* 142 A.D.2d 330, 335, 535 N.Y.S.2d 998, 1001 (3d Dep't 1988) (court should dismiss claim sua sponte for lack of standing because standing goes to jurisdictional basis of court's authority to adjudicate dispute). Indeed, the parties could not agree to allow the actions to go forward even if they were so inclined because standing (or subject matter jurisdiction) cannot be created by private agreement. The statements regarding the impact of the merger on the derivative suits are therefore extremely misleading if not plainly false. Further, there is a substantial likelihood that a reasonable shareholder would find the *legally certain* termination of the Bansbach and Lichtenberg Actions important in deciding how to vote.

## C. Officers' and Directors' Interests in the Merger

Plaintiffs contend that the Proxy so trivializes the financial windfall to the officers and directors as a result of the elimination of the derivative suits so as to constitute a material omission. In the section entitled "Interests of Executive Officers and Directors in the Merger," the Proxy states in pertinent part:

Besicorp and certain of its executive officers and directors (including former executives, officers and directors) are parties to two shareholder derivative lawsuits. As a result of the consummation of the Merger, the plaintiffs in such suits will cease to be shareholders which may adversely affect their ability to maintain such suits. The only shareholder of the Surviving Corporation following the Merger will be Acquisition which has indicated it will not pursue such suits. *If such suits are not main-*

tion of pursuing the Bansbach and Lichten-

*tained, certain of Besicorp's executive officers and directors who are defendants in such suits,* including Michael F. Zinn, Besicorp's Chairman of the Board, President and Chief Executive Officer, *may benefit.* (emphasis supplied).

Suffice it to say, stating that certain officers and directors "may benefit," is an understatement of colossal proportions. The termination of the Bansbach and Lichtenberg Actions would relieve the subject officers and directors of a combined potential liability in excess of $45.5 million dollars. In other words, the termination of the actions makes it absolutely certain that the subject officers and directors will never be forced to turn over $45.5 million dollars in disputed merger consideration to the previous shareholders of Besicorp. Again, the materiality of this omission is apparent.

## D. Recommendation of the Board of Directors

Finally, plaintiffs challenge the veracity of the statements that: (1) "[t]he Board has unanimously determined that the Plan of Merger is fair to, and in the best interests of, Besicorp and its shareholders;" and (2) "the Board believes that it is maximizing the return to Besicorp's shareholders ... by effectuating the Plan of Merger and the Spin–Off." Notwithstanding the tax benefits accruing to the shareholders as a result of the merger, as structured, the merger would have deprived the minority shareholders of the opportunity to pursue the Bansbach and Lichtenberg Actions. Put another way, the minority shareholders were potentially giving up an additional $25 per share (a 40% increase in merger consideration) which would instead be paid over to the defendant officers and directors, without the possibility of future recourse. It was simply preposterous for the Board to claim that by depriving its shareholders of the assets comprised of Besicorp's interest in the derivative suits

berg Actions.

and transferring these assets to an acquiring company for which they had no value, it was "maximizing the return to Besicorp's shareholders."

The Proxy describes in detail the various other options considered by the Board as alternatives to the cash-out merger (i.e., the partial liquidation alternative and reinvestment alternative); however, nowhere did the Proxy discuss another alternative which would obviously have been much more beneficial to the shareholders than the merger plan submitted for their approval—namely one which differed therefrom only in the respect that Besicorp's rights and liabilities with respect to the Bansbach and Lichtenberg Actions would be assigned to and assumed by Newco in the same fashion as those of the Enowitz Action. The conclusion is inescapable that the Board, for the personal benefit of the defendants, purposely chose not to assign the Bansbach and Lichtenberg Actions to Newco, thereby depriving the minority shareholders of these valuable contingent assets. Clearly, the merger as structured was not "fair to, and in the best interests of, Besicorp and its shareholders," nor does it "maximiz[e] the return to Besicorp's shareholders."

The Proxy is replete with the Board's purported justifications for the merger. Having thus undertaken to describe the motivation for structuring the transaction as they did, the Board was obligated to state all the important purposes of the merger, including that of extinguishing the Bansbach and Lichtenberg derivative suits. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1098 n. 7, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (if defendants choose to disclose their motives for a transaction, they must do so accurately); *Rubinstein v. Collins*, 20 F.3d 160, 166 (5th Cir.1994) ("a duty to speak the full truth arises when a defendant undertakes the duty to say anything").

In light of the above, there is a substantial likelihood that, at trial, the Proxy will be found to contain numerous material

omissions and statements of fact. *See Beatty v. Bright*, 318 F.Supp. 169 (S.D.Iowa 1970) (holding as a matter of law, proxy statement soliciting votes in favor of proposed sale of corporation that failed to disclose the nature of claims advanced in state derivative actions, the amount of recovery sought therein, and the fact that the sale would extinguish shareholders' right to maintain such actions, thereby relieving officers and directors of millions of dollars in potential liability, contained materially false statements and omissions in violation of § 14(a) of the Act and Rule 14a–9).

■■■■ Plaintiffs are also likely to make a sufficient showing of causation. They need not show "actual reliance" by establishing that a sufficient number of minority shareholders to constitute the two-thirds vote required to approve the merger relied specifically on the misrepresentations in voting in favor of the merger. *See Mills*, 396 U.S. at 384–85, 90 S.Ct. 616. Rather, they need only show that the "proxy solicitation itself ... was an essential link in the accomplishment of the [merger]." *Id.* at 385, 90 S.Ct. 616. A proxy solicitation is an "essential link" in the accomplishment of a merger when "minority proxies necessary and sufficient to authorize the [merger have] been given in accordance with the tenor of the solicitation." *See Virginia Bankshares*, 501 U.S. at 1100, 111 S.Ct. 2749 (clarifying holding in *Mills* and restricting extent of "essential link" doctrine to situations where minority shareholders' votes are necessary to authorize the transaction). This requirement has been met here because the majority shareholders (i.e., the Director Defendants) did not collectively own the two-thirds of all outstanding shares necessary for approval of the merger. The minority shareholder votes were therefore necessary, and such votes were in fact cast in favor of the merger.

■■■■ Finally, loss causation is established when a proxy solicitation would re-

sult or has resulted in a merger on terms that are unfair to the shareholders. *See Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 381 (2d Cir.1974). Accordingly, we hold that there is a substantial likelihood plaintiffs will succeed on the merits of their claims.

## II. *Irreparable Harm and Inadequate Remedy at Law*

 In support of their motion for a preliminary injunction, plaintiffs must prove both that they will suffer irreparable injury in the event the relief sought is not granted, and that no remedy at law will adequately compensate them for such injury. *See Buckingham Corp. v. Karp*, 762 F.2d 257, 262 (2d Cir.1985) (reversing district court's decision to grant preliminary injunction for failing to treat irreparable injury and inadequate remedy at law as separate and distinct elements). The subtle difference between these elements was clearly expressed by Judge Posner:

> The absence of an adequate remedy at law is a precondition to any form of equitable relief. The requirement of irreparable harm is needed to take care of the case where although the ultimate relief that the plaintiff is seeking is equitable, implying that he has no adequate remedy at law, he can easily wait till the end of trial to get that relief. Only if he will suffer irreparable harm in the interim—that is, harm that cannot be prevented or fully rectified by the final judgment after trial—can he get a preliminary injunction.

*Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir.1984) (citation omitted).

 The irreparable harms alleged by plaintiffs are: (1) the deprivation of the shareholders' opportunity to make a fully informed decision and vote with respect to the merger; and (2) the consequential loss of standing to adjudicate the Bansbach and Lichtenberg Actions. Both threatened harms were actual and imminent. By vir-

tue of the time restrictions present here (i.e., the inability to amend the Proxy before the merger vote was to take place), the shareholders were forced to vote on the basis of a materially misleading Proxy. This alone establishes the irreparable harm sought to be prevented by § 14(a) of the Act. "Irreparable injury results from the use of [materially] false and misleading proxies when the free exercise of shareholders' voting rights will be frustrated." *Krauth v. Executive Telecard, Ltd.*, 890 F.Supp. 269, 287 (S.D.N.Y.1995) (citing *Borak*, 377 U.S. at 431, 84 S.Ct. 1555 (1964)).

 Defendants maintain that plaintiffs' claims in this regard are barred by the equitable doctrine of laches because the alleged misrepresentations have been known to plaintiffs since the first draft proxy was filed with the SEC on December 2, 1998. The Court is not persuaded by this argument. "To succeed on a claim of laches, the Court must find . . . that the plaintiff delayed unreasonably and inexcusably in commencing the action." *Securities and Exchange Comm'n v. Willis*, 777 F.Supp. 1165, 1174 (S.D.N.Y.1991). At oral argument, defendants conceded that plaintiffs could not have instituted this action for violations of § 14(a) of the Act prior to the filing of the definitive proxy with the SEC on March 2, 1999. The complaint herein was filed on March 5, 1999. Any complaint filed prior to the filing and dissemination of the definitive proxy would have been subject to dismissal as premature.

> [S]uch drafts would hardly serve as a basis on which plaintiffs could file a federal securities lawsuit, as there would be no "actual case or controversy" as required under Article III of the Constitution until such time as the allegedly misleading proxy materials were officially issued.

*Scattergood v. Perelman*, No. 90–3451, 1990 WL 72801, at *6 (E.D.Pa. May 29,

1990).[11]

With respect to the second harm alleged, as a matter of law, plaintiffs would have lost standing to pursue the Bansbach and Lichtenberg Actions immediately upon consummation of the merger as set forth in the Merger Plan. *See, e.g., Friedman,* 929 F.2d at 79; *Rubinstein,* 91 A.D.2d at 446, 459 N.Y.S.2d 286. As a consequence, these causes of action collectively having a potential value of approximately $45.5 million dollars to the shareholders of Besicorp would have been terminated. Further, this Court will have no power to reinstate the derivative suits should plaintiffs prevail at trial. Once the actions were dismissed for lack of standing, there would have been no contingent asset for the Court to order assigned to Newco. Therefore, the injury threatened by the merger is irreparable in that it can not be prevented or fully rectified by the final judgment after trial.

In addition, neither of these injuries can be rectified by an action at law. "Fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange." *Borak,* 377 U.S. at 431, 84 S.Ct. 1555 (quoting H.R.Rep. No. 1383, 73rd Cong., 2d Sess., 13). Besicorp's shareholders would have been deprived of their statutory right to be free from deceptive proxy solicitations and their corresponding right to an informed vote. In addition, they would have been deprived of the option to pursue derivative actions potentially worth $45.5 million dollars.

Defendants argue that plaintiffs have an adequate remedy at law because they can file a class action on behalf of all shareholders who have been deprived of the value of these derivative actions by the

merger, asserting claims for breach of fiduciary duty. In fact, a supplemental claim for breach of fiduciary duty with respect to the merger is already included in the federal complaint filed herein. More particularly, plaintiffs allege that the directors and majority shareholders breached their fiduciary duty of candor by filing the materially misleading Proxy, their fiduciary duty of due care with respect to the structure and approval of the merger, and fiduciary duty of fair dealing owed by majority shareholders to minority shareholders. Unfortunately for the plaintiffs, the Court of Appeals for the Second Circuit has held that such claims for breach of fiduciary duty may "only be asserted derivatively on behalf of the corporation, and, after the merger, plaintiffs lack standing to assert such derivative claims." *See Friedman,* 929 F.2d at 79; *Press v. Marvalan Indus., Inc.,* 468 F.Supp. 1072, 1078 (S.D.N.Y.1979) (dismissing individual's suit alleging breach of fiduciary duty to corporation and to minority shareholders; remedy lay in shareholders' derivative action even though shareholder may have been injured individually by diminution of value of shares).

Thus under New York law, the exclusive remedy of a minority shareholder dissenting from a cash-out merger orchestrated by the majority shareholders is to obtain the fair value of his or her stock through an appraisal proceeding. *See* N.Y. B.C.L. § 623; *Alpert v. 28 Williams St. Corp.,* 63 N.Y.2d 557, 567–68, 473 N.E.2d 19, 483 N.Y.S.2d 667 (1984); (*Breed v. Barton,* 54 N.Y.2d 82, 85, 429 N.E.2d 128, 444 N.Y.S.2d 609).[12] A narrow exception exists, however, when the merger is unlawful or fraudulent with respect to the complain-

11. While defendants acknowledge the legal prematurity of any complaint filed prior to March 2, 1999, they argue that plaintiffs should have written a letter or made a phone call after dissemination of the initial draft proxy. The laches doctrine is concerned only with the failure to pursue legal rights and remedies. Thus, this argument is unpersuasive.

12. Plaintiffs could have elected to exercise their appraisal rights, however, the payment of a "fair value" for their shares would not compensate plaintiffs for the loss of the right to pursue the derivative actions.

ing shareholder, in which event an action for *equitable* relief is authorized. *See* N.Y. B.C.L. § 623(k); *Alpert,* 63 N.Y.2d at 568, 483 N.Y.S.2d 667, 473 N.E.2d 19. This exception does not allow shareholders to bring an action for damages; therefore, plaintiffs have no adequate remedy at law.

Even if plaintiffs were somehow able to maintain a class action seeking damages for breach of fiduciary duty with respect to the terms of the merger, such an action would not be adequate. The breach of fiduciary duty action would differ from the derivative actions in significant respects. First, the legal standard for establishing liability of the defendants in the fiduciary duty action strongly favors the defendants. Defendants would not be found liable for breach as long as the transaction viewed as a whole was fair to the minority shareholders and was justified by an independent corporate business purpose. *See Alpert,* 63 N.Y.2d at 566, 483 N.Y.S.2d 667, 473 N.E.2d 19. Therefore, as long as the value of the derivative suits was offset by the tax advantages of the merger, defendants would escape liability for breach of fiduciary duty as well as liability for the acts complained of in the derivative suits.

Second, assuming defendants were held liable for breach of fiduciary duty, the relief sought in the Bansbach and Lichtenberg Actions would not be available. Rather, the damages would be limited to those flowing directly from the breaches of duty associated with the merger (i.e., the loss of the ability to pursue the derivative actions). In order to ascertain the precise value of the prematurely terminated Bansbach and Lichtenberg Actions, the Court would have to engage in a theoretical analysis of the merits of such suits or conduct two mini-trials within the context of the fiduciary-duty trial. This remedy would be less accurate, prompt, complete and efficient—and thus inadequate. *See Firemen's Ins. Co. v. Keating,* 753 F.Supp. 1146, 1151 (S.D.N.Y.1990). Plaintiffs' claim seeking damages for violation of § 14(a) of the Act suffers from these same inadequacies.

Accordingly, we hold that plaintiffs have no adequate remedy at law.

III. *Relief Tailored to Preserve the Status Quo*

 Having established that plaintiffs are entitled to equitable relief, we now must determine what relief this Court is empowered to grant in order to preserve the status quo. Pursuant to Article III of the U.S. Constitution, this Court has comprehensive equitable jurisdiction with respect to cases and controversies properly before the Court. Such jurisdiction,

> is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.

*Romero–Barcelo,* 456 U.S. at 313, 102 S.Ct. 1798 (quotation and citation omitted). Where federally secured rights are invaded, and the statute is silent with respect to available relief, "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose." *See Borak,* 377 U.S. at 433, 84 S.Ct. 1555. Indeed, "federal courts may use any available remedy to make good the wrong done." *Id.*

Because a private cause of action for violations of § 14(a) of the Act is implied rather than express, the statute is silent with respect to the scope of available relief. *See Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423. Accordingly, the Supreme Court has held that a district court may fashion whatever equitable relief it deems necessary in order to effectuate the purpose of the Act. *See id.,* 377 U.S. at 433–34, 84 S.Ct. 1555; *Mills,* 396 U.S. at 386, 90 S.Ct. 616. Although the most common forms of equitable relief sought are the nullification of proxies, enjoining of the merger vote, or subsequent

setting aside of the merger, these remedies are neither exclusive nor mandatory. *See Mills,* 396 U.S. at 386, 90 S.Ct. 616. Here, plaintiffs were not seeking to prevent or otherwise delay the merger. They acknowledged that the shareholders would benefit from the tax consequences of the merger and would be further penalized due to the provision in the merger agreement requiring Besicorp to forfeit $1.4 million in the event the merger was not consummated on March 22, 1999. Rather, plaintiffs requested that this Court preserve the contingent assets and/or liabilities comprised of Besicorp's interest in the derivative suits by ordering the assignment of this interest to Newco.

 The purpose of § 14(a) of the Act is to "prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *Borak,* 377 U.S. at 431, 84 S.Ct. 1555 (citing H.R.Rep. No. 1383, 73rd Cong., 2d Sess., 13). To this end, the Act requires full and accurate disclosure of all material facts in proxy materials so that shareholders may seek "modification or reconsideration of the terms of the merger by those in control." *Schlick,* 507 F.2d at 384.

Here, the definitive Proxy was not filed with the SEC or distributed to the shareholders of Besicorp until March 2, 1999. Plaintiffs immediately filed suit on March 5, 1999 and sought expedited discovery and a preliminary injunction ordering the correction of the Proxy. A hearing on plaintiffs' motion for a preliminary injunction was held before this Court on March 16, 1999. It became clear at the hearing that an injunction ordering defendants to file a corrected proxy with the SEC and distribute it to shareholders would be neither feasible (because the merger vote was scheduled to occur on Friday, March 19, 1999) nor equitable (because postponement of the merger would significantly injure all parties). Therefore, the only way to effectuate the congressional purpose of the Act was to require the modification of the merger terms that the shareholders would have demanded had they been fully informed. On March 18, 1999, this Court accordingly ordered that the contingent assets and/or liabilities of Besicorp comprised of Besicorp's interest in the Bansbach and Lichtenberg Actions be assigned to Newco prior to the consummation of the merger.[13] *Cf. Beatty,* 318 F.Supp. at 174 (in action where shareholders sought recission of merger on basis of proxy solicitation materials containing material omissions and misrepresentation substantially similar to those at issue here, court preliminarily enjoined defendants from dismissing state derivative suits). This remedy preserved for the minority shareholders of Besicorp their very substantial economic interest in the derivative suits, without depriving the other parties to the merger of any asset which they considered worth having or pursuing. Thus, it was clear that the injunction would not make the merger deal less attractive for the acquiring companies, nor reduce the likelihood of its consummation.

In the interests of justice and equity, this Court allowed the merger to go forward substantially unmodified in all other material respects. In addition, we denied plaintiffs' request for an order requiring all merger consideration received by defendants Zinn, Enowitz and Eisenberg with respect to the disputed shares at issue in the Lichtenberg Action to be held in escrow pending resolution of that suit because plaintiffs failed to provide evidence of a statutory ground for such attachment pursuant to Rule 65 of the Fed-

---

13. Contrary to defendants' assertion, this relief is not unprecedented. *See* Fed.R.Civ.P. 70 (recognizing court's authority to direct the conveyance of real or personal property within its judicial district and authorizing the court, in lieu of directing a conveyance of such property, to enter a judgment divesting the title of any party and vesting it in others). Nor, as the defendants argue, is it unintelligible, as demonstrated by the defendants' own structuring of the Merger to achieve the same results with respect to the Enowitz Action.

eral Rules of Civil Procedure or C.P.L.R. § 6201. However, given defendants' concerted efforts to deprive the minority shareholders of their interests in the derivative suits, the injunction preserving the Lichtenberg Action would have been a vain decree if defendants Zinn, Enowitz and Eisenberg were not somehow restrained from secreting or alienating the merger consideration received with respect to the disputed shares at issue in that action. Therefore, the Court further ordered defendants Zinn, Enowitz and Eisenberg to take no action to place beyond the reach of the United States courts the disputed merger consideration, and thereby render the defendants unable to satisfy any judgment which may be rendered in the Lichtenberg Action.

■ Finally, in accordance with Rule 65(c) of the Federal Rules of Civil Procedure, this Court ordered plaintiffs to post a bond in the amount of $100,000 to secure defendants against any attorneys' fees and expenses which they may incur in defending the derivative actions should the preliminary injunction be found to have been improperly granted.

■ "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." *Romero–Barcelo,* 456 U.S. at 312, 102 S.Ct. 1798 (quotation and citation omitted). The Order of this Court dated March 18, 1999 did precisely this—it preserved the status quo while furthering the congressional policy behind the Act.

### IV. *Balance of Hardships*

■ Although it is unnecessary to show that the balance of hardships tips decidedly in plaintiffs' favor once it has been established that plaintiffs' are likely to succeed on the merits of their claims, we feel that a brief discussion of the equities involved is warranted. Had the Court refused to grant the relief set forth above:

(1) plaintiffs' would have been forever barred from recovering approximately $45.5 million dollars on behalf of the shareholders of Besicorp; (2) Acquisition, as sole shareholder of the surviving corporation would have appropriated valuable contingent assets of Besicorp (i.e., the derivative actions) without payment to Besicorp's (now Newco's) shareholders; and (3) said contingent assets would be valueless to Acquisition because it has repeatedly stated its intention not to pursue the claims. On the other hand, by granting the relief outlined above: (1) plaintiffs have gained nothing—the order simply preserved plaintiffs standing to maintain derivative actions already pending in state court; (2) defendants have lost nothing—the transfer of the contingent assets/liabilities to Newco had no adverse effect on the merger,[14] the individual defendants received the full amount of merger consideration with respect to the disputed shares and are free to invest and otherwise enjoy the proceeds so long as they do not place them beyond the reach of the U.S. courts; and (3) Acquisition is relieved of the cost of defending, maintaining, or moving to dismiss the derivative actions.

At the hearing on this matter, defendants argued that Newco is undercapitalized and could not afford to maintain the Bansbach and Lichtenberg Actions if the Court were to order such to be assigned to Newco. However, upon close examination of the Proxy it appears that the Escrow Fund established pursuant to the terms of the Merger Plan is available to fund the costs of these proceedings. Under the heading of "Litigation," the Proxy states that "Besicorp's liabilities and rights with respect to the legal proceedings to which it is a party are being assumed by and assigned to Newco pursuant to the Contribution Agreement." *See* Proxy at p. 54. It is further stated that "[i]t is anticipated that the Escrow Fund will be used to fund the legal and other costs of these proceedings." *Id.* By ordering the Bansbach and

---

**14.** The merger was consummated as planned on March 22, 1999.

Lichtenberg assets to be similarly assigned to Newco, the Court, in effect, simply placed these suits within the category of actions whose costs are covered by the Escrow Fund. Indeed, it appears that the defendants already intended the costs associated with the Bansbach Action to be covered by the Escrow Fund whether such assets were owned by Acquisition, the surviving company or Newco. Amendment No. 2 to the Proxy dated February 16, 1999 increased the Escrow Fund by $500,000 "on account of the commencement of two lawsuits against Besicorp and the reinstatement of a third lawsuit that had previously been dismissed [i.e., the Bansbach Action]."

For all of these reasons, it cannot be disputed that the balance of the hardships tips decidedly in favor of plaintiffs.

### CONCLUSION

For the reasons discussed above, plaintiffs' motion for a preliminary injunction is granted in part and denied in part as set forth in the Order issued on March 18, 1999.